**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne
Phillip Kim
Laurence M. Rosen
Henry Bloxenheim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: philkim@rosenlegal.com
Email :lrosen@rosenlegal.com
Email: hbloxenheim@rosenlegal.com

*Lead Counsel for the Putative Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LINKEDTO PARTNERS LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DEFI TECHNOLOGIES INC., OLIVIER ROUSSY NEWTON, PAUL BOZOKI, and STEFAN HANSSEN,<br><br>Defendants. | **CASE No.: 1:25-cv-06637 (NRM)(SDE)**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS**<br><br>**<u>CLASS ACTION</u>** |

## TABLE OF CONTENTS

Pages


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 5

III. PARTIES AND IMPORTANT NON-PARTIES .......... 5

IV. DEFENDANTS SCORE A LUCKY TRADE AND CLAIM THEY HAVE A SYSTEM 7

- **A. Defendants Claim DeFi Created a Sophisticated, Algorithmic, Market Analysis-based Arbitrage Trading Desk That Exploits Regularly Recurring Market Inefficiencies** .......... 7
- **B. "DeFi Alpha" Succeeds In 2024 Because of an Extraordinary Coincidence** 11
- **C. Alpha's Trading Is Risky, Has Limited Scope, and Is Easy for Competitors to Replicate** .......... 15
- **D. Defendants Misrepresent the Source of Alpha's Revenues To Secure a CDN $37.3 Million Cash Bonus** .......... 17
- **E. Defendants Continue To Tout Alpha In 2025 To List on the NASDAQ** .......... 19
- **F. Defendants Advance Impossible 2025 Revenue Guidance** .......... 20
- **G. DeFi Sells $100 Million of Its Artificially Inflated Stock** .......... 24

V. LOSS CAUSATION .......... 26

VI. DEFENDANTS' SPECIFIC ACTIONABLE STATEMENTS AND OMISSIONS .......... 30

VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER .......... 42

- **A. Wattenstrom's CDN $37.3 Million Bonus Provides Evidence of Scienter** .... 42
- **B. DeFi Alpha Was One of DeFi's Core Operations** .......... 43
- **C. Defendants' Repeated Statements About DeFi Alpha Are Probative of Scienter** .......... 43
- **D. Schlaufman Publicly Provided A False Description of DeFi Alpha's Operations** .......... 43
- **E. False Exculpatory Statements** .......... 44

VIII. AGENCY .......... 44

IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS.......................................................45

X. PRESUMPTION OF RELIANCE.................................................................................47

XI. COUNT I ..................................................................................................................48

XII. COUNT II .................................................................................................................50

XIII. PRAYER FOR RELIEF...............................................................................................51

Lead Plaintiff Jaime Romero, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants DeFi Technologies, Inc., Johan Wattenstrom, Olivier Roussy Newton, Russell Starr, and Curtis Schlaufman ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I. INTRODUCTION[1]

1. This is a class action brought on behalf of persons or entities who acquired publicly traded DeFi Technologies stock from May 15, 2024 through November 13, 2025, both dates inclusive ("Class Period"), and who held such shares through at least one of the corrective disclosures identified below, bringing claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2. In mid-2024, through extraordinary luck, DeFi found itself with CDN $430 million of freely tradable Solana tokens just as crypto brokerage firm FTX was very publicly selling tens of millions of locked-up Solana tokens at a discount. Defendants made a simple, obvious trade, buying FTX's tokens in a public auction, substituting them for DeFi's freely tradable tokens, and selling the freely tradable tokens. Because it took an extraordinary coincidence, there was no chance the trade would repeat at scale. To conceal that they benefited from a once-in-a-lifetime opportunity, Defendants told investors the profits were attributable to a newly-created—actually entirely fictitious—arbitrage trading desk that was using algorithmic models and deep market research to identify risk-free arbitrage opportunities that were supposedly constantly recurring. Defendants cited the recurring opportunities and the skill required to exploit them to justify paying DeFi's co-founder a CDN $37.3 million discretionary cash bonus. But though DeFi made

[1] Unless otherwise noted, all emphases are added.

additional, much smaller trades, it could not repeat its 2024 results because there had never been an arbitrage trading desk and the 2024 trade was just a stroke of luck. DeFi's stock price fell from its Class Period high of $4.25 to end at $1.05, damaging investors.

3. In May through July 2024, through an extraordinary coincidence, DeFi found itself in a position to make more than CDN $130 million in a single trade.

4. DeFi sells cryptocurrency token-backed Exchange Traded Products, or "ETPs" (ETP is the European name for Exchange Traded Fund, or "ETF") to its customers. These ETPs are designed to give investors exposure to cryptocurrency tokens without the hassle of owning the tokens outright.

5. In 2021 and 2022, DeFi created and listed ETPs for 10 different cryptocurrencies. One of them, though by no means the most popular one, was Solana.

6. Initially, the Solana ETP's sales were not spectacular. By December 31, 2022, DeFi held only 0.42 million Solana tokens, worth CDN $5.4 million, or about 5% of the total value of its tokens.

7. But in the second half of 2023 and the beginning of 2024, sales of the Solana ETP took off. By September 30, 2023, DeFi held 0.93 million Solana tokens; by March 31, 2024, 2.03 million.

8. At the same time, the price of Solana soared tenfold from $21.40 on September 30, 2023 to $202.87 on March 31, 2024.

9. Still at the same time, a huge number of locked-up Solana tokens were entering the market. Disgraced cryptocurrency fund FTX had held more than 10% of all Solana tokens, most of which were subject to trading restrictions. In May 2024, FTX held a public and widely

publicized auction of its locked-up Solana tokens. The tokens were sold at a discount because they were not freely tradable.

10. DeFi placed a bid in the auction. Its bid was successful; it was awarded 1.7 million Solana tokens. DeFi then substituted the locked-up tokens it had just purchased into its Solana ETP, sold the freely tradable tokens that had backed the ETP, and kept the profit. It made more than CDN $130 million in a single trade.

11. Through no credit of their own, Defendants benefited from a once-in-a-lifetime opportunity to provide exactly what the market needed at exactly the right time. The trade did not require any skill, and it was not repeatable. It was also incredibly risky. If Solana's price doubled and a mere 25% of Solana ETP holders sought redemption, DeFi would have had to pay redeemers $52 million, but it held less than CDN$20 million.

12. When it explained the profits to investors, Defendants did not mention the trade that had created it, still less that the trade was not repeatable and only required that Defendants notice a widely-publicized auction. Instead, Defendants claimed that the profits resulted from the creation of a new arbitrage trading desk called DeFi Alpha that used sophisticated algorithmic trading strategies and deep market research and modeling to identify regularly recurring opportunities for riskless profits. The trading strategies, market research, modeling, recurring opportunities, and even the arbitrage trading desk itself, were all fictitious; the profits were risky, because Defendants could not sell locked-up Solana tokens to meet Solana ETP redemption requests and so hazarded DeFi's very existence.

13. Defendants never had any hope of repeating the 2024 trade. But they used the myth of the arbitrage trading desk to great effect. First, DeFi co-founder Johan Wattenstrom, DeFi Alpha's loudest booster, helped himself to a CDN $37.3 million bonus based on the 2024 trade.

Defendants justified the bonus to irate shareholders on grounds that shareholders could expect more hugely profitable DeFi Alpha trades and that DeFi needed to pay enormous bonuses to retain its supposedly top-tier trading talent.

14. Second, DeFi rode Defendants' misstatements about DeFi Alpha all the way to a NASDAQ listing. To list on the NASDAQ, DeFi needed to raise its stock price to $2 and keep it there. To justify their claims that DeFi's stock was worth more than $2, Defendants claimed that the revenues from the FTX trade were actually recurring DeFi Alpha revenues. The market took heed; DeFi's stock price more than doubled with the DeFi Alpha trades. Had investors understood that DeFi Alpha was just DeFi's way of describing a one-off trade, they would not have bid up DeFi's shares.

15. Third, Defendants used the false statements to raise $100 million in cash. Having complained for more than a year that DeFi's stock was undervalued, on August 22, 2025, Defendants announced a stock buyback program. Defendants claimed the stock was undervalued on August 22, too, but DeFi bought back marginal amounts of stock, less than $200,000 worth by September 9. Then, on September 25, 2025, Defendants announced that DeFi was selling $100 million of stock at a price significantly lower than its trading price on August 22. The offering should not have been necessary because Defendants maintained that DeFi Alpha would earn revenues of $85 million in the remainder of 2025.

16. As the markets slowly realized that the initial DeFi Alpha revenues were not repeatable, DeFi's stock price fell. It fell 11.1% on July 7, 2025, when DeFi announced a month without any DeFi Alpha revenues. It fell 12.4% on August 15, 2025, when Defendants announced that DeFi might not close DeFi Alpha transactions in 2025. It fell 20.3% on September 25, 2025, when Defendants announced they were raising $100 million they would not have needed if they

could make $85 million in DeFi Alpha revenues, calling into question whether they would earn the $85 million. And it fell 27.6% on November 14 and 17, 2025, two consecutive trading days, when Defendants finally admitted that they did not expect any more DeFi Alpha revenues in 2025.

17. As this Complaint is filed, DeFi has not earned DeFi Alpha revenues since a tiny trade in November 2025.

## II. JURISDICTION AND VENUE

18. The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

21. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of DeFi Technologies common stock in this District.

## III. PARTIES AND IMPORTANT NON-PARTIES

### A. Parties

22. Plaintiff Jaime Romero, as set forth in his PSLRA certification, which was previously filed and is incorporated by reference herein (Dkt. No. 11-2), purchased DeFi

Technologies stock at artificially inflated prices during the Class Period and suffered damages thereby.

23. Defendant DeFi Technologies is organized under the laws of Ontario, Canada, with principal executive offices located at Suite 2400, 333 Bay Street, Toronto, Ontario, Canada M5H 2T6. Since May 12, 2025, DeFi's shares have traded on the NASDAQ under ticker symbol "DEFT". Before then, DeFi's shares traded over the counter in the United States and in several foreign exchanges. DeFi manages various crypto-related businesses.

24. Defendant Olivier Roussy Newton co-founded Valour Inc. and DeFi Technologies. Newton was appointed Chief Executive Officer on October 6, 2022 and elected Executive Chairman on June 20, 2023. Newton served as CEO and Executive Chairman throughout the Class Period and held those roles until he resigned from all then-held DeFi positions in November 2025. DeFi thereafter retained Newton as a Strategic Advisor beginning in December 2025. During the Class Period, Newton exercised substantial control over DeFi's public messaging and strategy, including statements concerning DeFi Alpha. Defendant Newton sat on DeFi Alpha's 3-member compensation committee even as he served as its CEO, a rare occurrence in public companies because it creates a potent conflict of interest.

25. Defendant Johan Wattenstrom co-founded Valour and DeFi Technologies. Wattenstrom served as DeFi's Chief Operating Officer from October 2021 until his resignation in October 2022. He remained in his position as Valour's CEO. Throughout the Class Period, Wattenstrom repeatedly appeared on DeFi earnings calls, spoke substantively about DeFi Alpha, and described its trading strategy, pipeline, and expected contribution to future revenue. In November 2025, Wattenstrom was appointed Executive Chairman of the Board and Chief Executive Officer of DeFi, taking over from his co-founder Newton.

26. During the Class Period, Defendant Russell Starr served as DeFi's Head of Capital Markets until his resignation in June 2025. Previously, Starr had served as DeFi's Chief Executive Officer and Executive Chairman until he was replaced by Newton in those roles in 2022 and 2023. Starr participated in DeFi's earnings calls and investor-facing communications, including discussions of DeFi Alpha's profitability, valuation implications, and expected contribution to DeFi's future results.

27. Defendant Curtis Schlaufman ("Schlaufman") is the vice president of Marketing & Communications for both DeFi and Valour and has been since 2021. Defendant Schlaufman headed DeFi's investor relations department.

### B. Important Non-Parties

28. Valour Inc. is a fully owned subsidiary of DeFi Technologies. Founded by Defendants Wattenstrom and Newton in 2019, Valour was "purchased" by DeFi in a 2021 reverse merger. Valour is incorporated under the laws of the Cayman Islands, with a principal place of business in Zug, Switzerland, with its Board of Directors and management team located at Bundesstrasse 3, CH-6302 Zug, Switzerland. Valour manages DeFi's ETP business and DeFi Alpha's operations.

## IV. DEFENDANTS SCORE A LUCKY TRADE AND CLAIM THEY HAVE A SYSTEM

### A. Defendants Claim DeFi Created a Sophisticated, Algorithmic, Market Analysis-based Arbitrage Trading Desk That Exploits Regularly Recurring Market Inefficiencies

29. On May 14, 2024, in a press release discussing Q1 2024 results, DeFi Technologies claimed that it had created a new business unit, which it called DeFi Alpha.

30. In the press release, Defendants described DeFi Alpha as an "alpha-generating business … focus[ed] on arbitrage trading opportunities in the digital asset space with low risk in both centralized and decentralized markets … minimizing downside revenue volatility."

31. The announcement astounded investors. In less than a month, DeFi Alpha had earned more than three times DeFi's total Q1 2024 revenues.

32. On an earnings call held May 21, Defendants claimed that DeFi Alpha employed sophisticated arbitrage trading strategies. As Defendant Starr claimed, "because of the [crypto] industry and how nascent it is, you do see these arbitrage opportunities appear very, very regularly where you can take low-risk arb[itrage] positions and capture meaningful gains." Defendants claimed that DeFi Alpha involved "taking advantage of" "market inefficiencies."

33. Defendants promised more detail. According to Defendant Newton, DeFi would "launch[] a website that presents the business overview of DeFi Alpha in more specific context." He promised that "more information [was] coming soon in terms of us DeFi Technologies opening up our Alpha trading desk for more business and the specific parameters about what that business pertains to."

34. Defendants then posted DeFi Alpha's business overview on DeFi's website. While light on details, it maintained, concerning DeFi Alpha, that it "[u]tiliz[es] sophisticated ***algorithmic strategies*** and comprehensive ***market analysis*** … target[ing] ***inefficiencies and discrepancies*** in digital asset pricing to … identify and capitalize on low-risk arbitrage opportunities within the cryptocurrency market."[2]

---

[2] The disclosure reads:

> DeFi Alpha, a specialized arbitrage trading desk under DeFi Technologies, is designed to identify and capitalize on low-risk arbitrage opportunities within the cryptocurrency market. Utilizing sophisticated algorithmic strategies and

35. On a call to discuss Q3 2024 earnings taking place on November 15, 2024, Wattenstrom stated that DeFi Alpha employed a sophisticated model-based arbitrage system:

> ***But obviously, we have also the systematic trading and the rationale for forming DeFi Alpha was also to make the monetization of the balance sheet in total, both fiat and crypto assets, much more efficient and drive the monetization rates.*** So, within that context, without taking any market exposure, we see a lot more opportunities now in Q4 in terms of all the arbitrages and short-term transactions that actually doesn't affect our exposure, but what we couldn't do earlier in that low turnover, lower AUM environment, so both the flow and increased AUMs and decreased number of assets are driving our opportunities we see and the opportunities we engage in at the moment and going forward throughout Q4.
>
> ***So it's not just going after one-off trades. It's also about building the infrastructure that we've been focusing on a lot since Q2. We have increased the bandwidth quite a lot in the team in regards to both development of infrastructure, agreements with counterparties, and the focus and the research into these opportunities.*** So, it's very hard to be very specific about this early on because obviously, it's something that is an immense growth in our ability to participate here during this quarter and last quarter.
>
> And a lot of the fruits of this work we'll probably see more of next year. But it's – yes, in this market environment, it's – since the bull market started here and bitcoin broke out to new all-time highs as well, that has just been an immense change for the daily opportunities we see as well. Yet that also paired obviously with our stronger balance sheets.

36. Then, on a call to discuss Q4 2024 earnings, held on March 31, 2025, Wattenstrom confirmed that in addition to one-off trades, DeFi Alpha was generating revenues daily based on model-driven arbitrage strategies:

> So, in general, for the DeFi Alpha, the main points here, I would say, is ***we have two parts of it.*** One is the larger deals, where we built a significant pipeline with deals that we are at high conviction will happen within Q2, Q3 … ***The other part here, which is more consistent on a day-to-day basis, is the more model-driven***

---

> comprehensive market analysis, DeFi Alpha targets inefficiencies and discrepancies in digital asset pricing to

The first sentence states DeFi Alpha's purpose, while the second sentence states the means by which it accomplishes the purpose and ends with a hanging "to." Thus, reasonable investors would assume that Defendants were communicating that Alpha accomplished the ends set out in the first sentence by the means set out in the second sentence and that the disclosure's facially incorrect phrasing is just an editing mistake.

> ***type of arbitrage strategies, which are kind of integrated with our daily flow management and also the management of our balance sheet in terms of monetization of our full balance sheet including liquidity, digital assets and support, which gives us quite a unique position to take advantage of a lot of both arbitrage and other type of model-driven strategies.***

37. Wattenstrom added that DeFi Alpha "***trades are more uncorrelated to the core business cash flow we see from the optimization and monetization of our AUM.***"

38. On the next earnings call, taking place May 14, 2025, Defendant Wattenstrom reiterated that DeFi Alpha earned regular revenues and did not take significant risks:

> Yeah, for sure. Maybe for context for new listeners, I should also reiterate a little bit what we do in DeFi Alpha. So it's basically, we're - on our balance sheet, we hold quite a lot of different digital assets and fiat assets, obviously. And we — as a part of starting with a treasury function to optimize the earnings and the monetization of our full balance sheet. We last year started DeFi Alpha as a more focused effort to do trades that are not typically within our treasury or optimization strategies that are typically more start-arb type of basis trading, arbitrage as lending, staking and so forth.
>
> Whilst DeFi Alpha looks at more — in beginning opportunistically at large trade, distressed ones and other trades with foundations with funds and with other counterparties within the ecosystem where ***we have a unique position given our platform, our vertical integration for our businesses and the assets on our balance sheet where we actually without market risk are pursuing these trades*** where we did over $100 million last year and we have just recently announced, as we said earlier, first CAD22 million revenue-generating trade for the year, but also during the last year from our last call, our pipeline has strengthened significantly. Especially now with the market coming back up, we are much - even more optimistic than on the last call regarding the next few trades in the near future, but also for the pipeline for the rest of the year.

39. Similarly, in DeFi's Q1 and Q2 2025 MD&A, Defendants stated:

> Defi Alpha, a specialized arbitrage trading desk with the sole focus is to identify low-risk arbitrage opportunities within the crypto ecosystem. ***The Defi Alpha trading desk is strategically designed to focus on identifying and capitalizing upon arbitrage opportunities within the dynamic digital assets market. Utilizing advanced algorithmic strategies and in-depth market analysis, the trading desk aims to generate alpha by exploiting inefficiencies and discrepancies in digital asset pricing.*** The primary focus is on arbitrage trading opportunities in both centralized and decentralized markets, ensuring minimal market or protocol exposure to mitigate downside revenue volatility.

40. Reinforcing that Alpha was based on sophisticated modeling and hedging, Defendants insisted that DeFi Alpha took no risks. Indeed, on DeFi's Q1 2025 earnings call, Defendants referred to DeFi Alpha's revenues as "risk-free."

**B. "DeFi Alpha" Succeeds In 2024 Because of an Extraordinary Coincidence**

41. Defendants made their successful 2024 "DeFi Alpha" trade through DeFi's Exchange-Traded Products, or ETPs (the European name for ETFs).

42. Valour, Defi's principal subsidiary, offers ETPs. Instead of stocks, however, Valour's ETPs are based on cryptocurrency tokens.

43. Valour ETPs are backed by actual tokens. When investors buy ETP units from a Valour fund, the fund then purchases the reference cryptocurrency token.

44. As a result, in the ordinary course business, Valour comes to hold significant quantities of cryptocurrency tokens.

45. In 2021 and 2022, Valour launched a series of ETPs based on ten different coins, one of which was Solana. Defendants plainly did not expect the Solana token to be a smash hit. They announced Solana ETP listings alongside many others.

46. Valour's Solana ETP did not attract much interest at first. By December 2022, Valour had only 0.42 million Solana coins, worth CDN $5.4 million, or only about 5% of the total value of its coins. Bitcoin, Ethereum, and Cardano ETPs all attracted significantly more interest.

47. In 2023, Solana ETP sales took off. By September 30, 2023, Valour held 0.93 million Solana tokens, with a value as of that date of $25.5 million. By December 31, 2023, Valour held 1.68 million tokens. By March 31, 2024, it held 2.03 million tokens.

48. Even as Solana ETP's sales grew, the price of Solana tokens soared from $21.40 on September 30, 2023 to $202.87 on March 31, 2024.

49. Because DeFi customers bought more Solana ETP units and because the price of Solana tokens soared, DeFi's Solana holdings rose to half of its total holdings.

*Solana Comes To Make Up Half of DeFi's Holdings*

| | September 30, 2023 | December 31, 2023 | March 31, 2024 |
|---|---|---|---|
| Number of tokens | 0.93 million | 1.69 million | 2.03 million |
| Price of Solana token | $21.40 | $101.51 | $202.87 |
| Total value of Solana tokens (CDN) | CDN $25.5 million | CDN $235.7 million | CDN $429.7 million |
| Total value of all tokens | CDN $178.7 million | CDN $489.9 million | CDN $875.4 million |
| Solana % of value of all tokens | 14.3% | 48.1% | 49.1% |

50. DeFi might not have been able to earn significant profits from its Solana ETP, despite its popularity. But in May 2024, by chance, a huge cache of locked-up Solana tokens came up for sale.

51. In November 2022, broker FTX, one of the largest crypto brokers at the time, filed for bankruptcy.

52. Sam Bankman-Fried, FTX's CEO, was closely linked with Solana, promoting it on social media and describing himself as a "fanboy" of the token in a 2021 Forbes article. He was also one of Solana's major backers and played a pivotal role in launching and sustaining a decentralized exchange that was one of Solana's flagship applications. Both FTX and its affiliate Alameda Research participated in multiple rounds of funding, acquiring vast amounts of Solana tokens.

53. As of the time of its bankruptcy, approximately $1.16 billion of FTX's $3.4 billion crypto portfolio consisted of Solana tokens. FTX and Alameda Research held about 58 million Solana tokens, or about 11% of the total Solana supply, much of it locked up.

54. On December 16, 2023, FTX filed its Disclosure Statement. On May 1, 2024, the bankruptcy court scheduled a hearing to consider the Disclosure Statement on June 26, 2024. The FTX estate intended to make distributions in cash rather than in kind, so it needed to sell FTX's Solana tokens promptly.

55. The estate initially sold the Solana tokens to crypto industry insiders. On April 5, 2024, FTX sold between 25 million and 30 million locked-up Solana tokens at $64 per token. The purchasers were identified in bankruptcy filings and press reports as large crypto insiders such as Galaxy Trading. DeFi was not invited to participate so it did not buy any tokens at the $64 price.

56. Creditors alleged the sale process shortchanged the estate because Solana tokens traded for $172 at the time of the sale. That the purchasers were clients of the bankruptcy trustee's counsel further drew creditors' ire. Creditors pressed the bankruptcy trustee to use an open process to sell FTX's remaining Solana.

57. The pressure campaign worked. On April 22, 2024, the trustee announced that the estate would sell the remaining tokens in public auctions rather than individual private deals. The first blind auctions took place in April and May 2024 and closed on May 24.

58. Thus, through extraordinary luck, DeFi found itself holding 2 million freely tradable Solana tokens just as FTX was liquidating tens of millions of locked-up Solana tokens not in a private sale from which DeFi was excluded but in a public auction.

59. DeFi's bid was successful. It bought 1.63 million Solana tokens in the auction at a weighted average price of $101.4 per token.

60. DeFi then substituted the locked-up Solana tokens for the freely tradable Solana tokens that backed Valour's ETP, and sold the freely tradable tokens.

61. DeFi also bought 931,445 locked-up Avalanche tokens from the FTX estate at a price of $11 per token. Just as with Solana tokens, DeFi substituted locked-up Avalanche tokens for freely tradable Avalanche tokens and sold the freely tradable Avalanche tokens.

62. In doing so, DeFi exhausted its supply of both Solana and Avalanche freely tradable tokens. As of June 30, 2024, DeFi held only 0.122 million freely tradable Solana tokens worth CDN $29.0 million. As of September 30, 2024, it held only 0.063 million freely-tradable Avalanche tokens, worth CDN $2.4 million.

63. DeFi's "arbitrage trading desk" was just Defendants' description of the source of the profits of the FTX trade. DeFi Alpha had no separate employees, funds, or assets. It was not a distinct legal entity. It is simply the hat Valour employees wore when they tried to replicate the 2024 Solana and Avalanche trade. In all of 2024, "DeFi Alpha" did not even complete any additional trades. And "DeFi Alpha" had only one trading strategy: replicating the initial FTX trade.

64. After the Class Period, Defendants admitted that Alpha had only ever employed the discounted token strategy outlined above.

65. Announcing Q3 2025 earnings, Defendants admitted that DeFi's "arbitrage" consisted of buying discounted tokens and selling corresponding publicly traded tokens:

> DEFENDANT NEWTON: Yes. Happy to answer that. So basically, with that trade and I think two other trades historically, as I think we've communicated before, we have hedged all market risk for the core operation. We have a part of the profit, locked in profit for this trade and two of the historical trades ***has been retained in tokens.*** So to that respect, the profits - some of the profit is locked up and in tokens.
>
> So that part of the profit will obviously fluctuate a bit with the market. We will get the higher profit if trade market goes higher and slightly lower if market goes down.

> Whilst the core — the arbitrage itself is 100% hedged for the principal, ***the pure profit we locked in is retained in tokens that will be locked for a bit.***

66. Announcing Q4 2025 earnings, Defendants revealed that DeFi Alpha had not earned any revenues in Q4 2025.

67. On the investor call, Defendants disclosed that DeFi Alpha had limited capacity per coin.

> **Q:** Okay. That's great. And then I guess on DeFi Alpha, just -- I mean, is it fair to assume that in a crypto winter, there is probably less near-term opportunities for that business?
> **DEFENDANT WATTENSTROM:** Yes. I think it's fair to assume. I think for at least a few of them. I think there have been new opportunities on our radar here, which might be actually doable in this climate. But I would say, in general, we are also on our side, less keen to do it because ***we have a certain capacity per coin to pursue these trades without any market risk***. And obviously, with higher markets, we will make much, much more on the trades. So yes, there's less opportunity.

68. DeFi only had so much capacity per coin because it needed a freely tradable token for every locked-up token it purchased, as well as a cushion on top.

69. Then, in announcing Q1 2026 earnings, Defendants admitted that DeFi Alpha had no other strategy. In DeFi's Q1 2026 MD&A, Defendants admitted that "DeFi Alpha trades made since the initial DeFi Alpha trade 2024 [sic] have ***all*** been locked token trades."

### C. Alpha's Trading Is Risky, Has Limited Scope, and Is Easy for Competitors to Replicate

70. Defendants' statements that DeFi Alpha engaged in a broad variety of sophisticated arbitrage strategies, when in fact DeFi only ever bought discounted locked-up coins from desperate sellers, concealed three main risks.

71. First, the initial FTX trade took an extraordinary coincidence. DeFi's Solana ETP had to take off in late 2023. At the same time, Solana's price had to increase massively—tenfold, in fact. As a result, DeFi held CDN $430 million of Solana tokens through no efforts of its own.

But that in itself was not enough. To monetize its Solana, DeFi also needed a third party forced to quickly sell locked-up Solana tokens.

72. Second, it exposes DeFi to potentially catastrophic risk. DeFi's ETP buyers may redeem their stake by tendering their ETP shares. DeFi holds a cushion of freely tradable Solana tokens that it can use to meet limited redemption requests, but that cushion was thin. As of June 30, 2024, DeFi only held 0.122 million freely tradable Solana tokens, or only 6.0% of the Solana ETP's holdings as of March 31, 2024. DeFi is thus vulnerable to a classic bank run. If, for example, Solana's price had doubled again to $400 and investors holding 25% of the 2.03 million Solana tokens had sought redemption, DeFi would have had to pay out $52 million in cash, though it had only CDN$19.5 million in cash and cash equivalents.

73. In any case, to achieve at least some protection against runs, DeFi cannot ever fully exhaust its supply of freely tradable coins. It must always leave a cushion.

74. Third, Defendants' false statements concealed that Alpha's business model is fully replicable by any company that holds piles of crypto tokens but whose liabilities are denominated in the token's price. DeFi purportedly takes no risk with Alpha trades because its ETPs track the price of its coins. For example, if an investor buys $200 of Solana when Solana is trading at $200 per token and redeems the investment when Solana is trading at $100 per token, Valour owes the investor $100 (the value of one Solana token), not $200 (the initial investment).[3] But there are numerous other ways to replicate this structure. Any company can create ETPs, but that is not even necessary. Treasury companies—holding companies whose only asset is a cache of tokens—can offer exactly the same service.

[3] Ignoring all fees.

**D. Defendants Misrepresent the Source of Alpha's Revenues To Secure a CDN $37.3 Million Cash Bonus**

75. Through their false statements, Defendants created the misleading impression that the FTX trade revenues were repeatable and low risk, and required trading skill. Defendant Wattenstrom relied on the false impression these statements created to award himself a CDN $37.3 million discretionary cash bonus.

76. In 2024, Defendants awarded extraordinary bonuses to "management" attributed entirely to Alpha's success:

> During the year ended December 31, 2024, the Company paid management US$20,000,000 and 3,998,508 DeFi shares valued at US$6,273,870 related to DeFi Alpha trading profits.

77. While Defendants did not publicly identify the recipient of the extraordinary bonus attributed to DeFi Alpha, DeFi's 2025 Management Circular—filed in Canada but omitted from U.S. filings—reported that Wattenstrom received a discretionary 2024 cash bonus of CDN $37.3 million.[4] The cash bonus was:

a. 70 times his annual 2024 salary;

b. 100 times his total 2023 compensation;

c. 15 times his total 2025 compensation;

d. Almost CDN $15 million more than DeFi's total cash and cash equivalents as of December 31, 2024; and

e. 28.2% of "DeFi Alpha's" total revenues to date.

[4] The bonus would be reported in DeFi's income statement under operating, general, and administrative expenses, which totaled CDN $50.3 million in 2024, or less than the sum of CDN $37.3 million and US$20 million. There is no room in the entry for Wattenstrom's bonus and another $20 million. Thus, Wattenstrom was the recipient.

78. Wattenstrom would not have been able to take almost 30% of DeFi Alpha's revenues for himself if he had disclosed that it resulted from sheer unrepeatable luck and a risky trade. Indeed, when Defendants tried to justify the bonuses without also claiming that the trades were repeatable, they faced an investor revolt.

79. When they issued a press release announcing Q2 2024 earnings, Defendants did not raise full year 2024 revenue guidance to take into account potential additional DeFi Alpha revenues. Between issuing the press release and the earnings call held hours later, investors expressed dismay. DeFi was forced to address the investor protest. In prepared remarks, DeFi's CFO stated:

> One of the major concerns that people have had with our [press release] today was that they're making the incorrect assumption that we're not going to make any more DeFi Alpha trades. Maybe you [Defendant Newton] or Johan [Wattenstrom] can elaborate on the fact that we are—the reason we didn't give guidance on DeFi Alpha further wasn't because we don't think we're going to continue to make money on DeFi Alpha. It was because we just want to get another quarter or two of decent returns under our belt so that we can guide appropriately.

80. As Defendants claimed in response to an analyst question, the bonuses were only justified because exploiting DeFi Alpha opportunities took a great deal of skill and DeFi Alpha trades were repeatable:

> **DEFENDANT NEWTON** [READING A WRITTEN QUESTION]: Next question is from Michael Kim. I appreciate the updated guidance revenue, but any change in thinking on the forward outlook for expenses, and particularly as it relates to accruing for DeFi Alpha trading bonuses?
>
> * * * * *
>
> **DEFENDANT STARR**: And maybe just I'll add just quickly, Mike. Mike is, by the way, the analyst at Zacks, just so everyone knows.
>
> Mike, the objective also is, with a consultant both on the legal and the consultancy side, this will be a fair, reasonable market standard. It's not something where we're not taking it seriously and looking at this from a prudent perspective. It'll be backed very, very clearly by market standards and these independent individuals.

> And on the flip side, with Johan [Wattenstrom] sitting here, I think everybody needs to understand what everybody's forgetting here, and I'm getting a lot of this today from people. It's like, well, you didn't guide higher on your trading desk, so you don't think you're going to make any more on trades. That's not at all what we did. What we decide to do was guide on basically AUM growth, which even that is ridiculously low. We're on-track for $50 million, $60 million, just off of our AUM, and obviously with Africa, Middle East, and all these other jurisdictions, that could be substantially higher. ***We fully believe that Johan and his team will continue to execute. We just don't know what that quantum will be, but if you look at it from a large lens versus, oh, wow, look at their SG&A*** [the financial statement line item on which DeFi Alpha bonuses would be reported], ***that's not the way to look at this. These guys have hit it out of the park, and we want them to feel comfortable in their seats continuing to do so, which will benefit all shareholders.***
>
> Johan, I don't think —I think that's a very fair way of looking at it. ***You can't have people do what these guys have done and not take into consideration nothing short of world-class returns.***

81. Thus, Defendants themselves linked the DeFi Alpha bonuses to purported skill and repeatability. They could not have paid bonuses if the Alpha trades were non-repeatable, took little skill, and exposed DeFi to catastrophic risks.

**E. Defendants Continue To Tout Alpha In 2025 To List on the NASDAQ**

82. Since at least early 2024, Defendants have maintained that DeFi's market valuation was far lower than its operations justified.

83. Defendants blamed, in part, the lack of a U.S. stock exchange listing. For example, on the Q1 2024 call, Defendant Newton explained that "we remain committed to extracting as much shareholder value and realize that, that will happen on a global stock exchange. So that is definitely a top priority for management." Indeed, as Starr explained on the June 30, 2024 Crypto Kids podcast, "[w]e're looking to uplist to the NYSE or NASDAQ when the share price gets high enough."

84. And Defendants understood and acknowledged that to be traded on the NASDAQ, DeFi's stock price had to exceed $2/share. As Starr continued on the podcast "we just need the stock to be at $2, and we're moving these closely."

85. Without DeFi Alpha, DeFi's stock price was not reaching the $2 threshold. With DeFi Alpha, DeFi's stock price had the chance to increase. Defendants' argument was based on their contention that "DeFi Alpha" was not a one-off trade but a persistent source of revenues. For example, on the Q1 2024 call, Defendant Starr maintained that "I would argue, based on where we're guiding and based on what we've told you, we're actually cheaper now at [CDN] $1.10 or $1.20 than we were at $0.80 or $0.60 when we ***had a different revenue model because we hadn't started DeFi Alpha.***"

86. Defendants' claim that DeFi Alpha had transformed DeFi's revenue model had its intended effect. DeFi announced DeFi Alpha's first profits on the May 14, 2024 Q1 2024 earnings call. Within a month, and bolstered by a June 3 announcement of a further $43.4 million in profits, DeFi's stock price nearly quadrupled from US$0.63 to $2.26.

87. As alleged above, DeFi investors pounced when they interpreted Defendants' statements to mean that DeFi Alpha revenues were not repeatable. Thus, Defendants had to convey that DeFi Alpha revenues were repeatable.

88. Having reached a $2 bid, DeFi filed a Registration Statement for a NASDAQ listing in mid-September 2024. DeFi was listed on the NASDAQ on May 12, 2025.

**F. Defendants Advance Impossible 2025 Revenue Guidance**

89. In 2025, Defendants claimed that they would repeat DeFi Alpha's 2024 performance. Investors did not know that DeFi Alpha had no trading strategies other than buying discounted locked-up tokens, substituting them for freely tradable tokens in Valour's ETPs, and selling the resulting tokens. Thus, they did not know that DeFi's guidance was unachievable.

90. On March 31, 2025, in the course of announcing DeFi's Q4 2024 results, Defendants issued 2025 revenue guidance of CDN $227 million. While Defendants did not provide specific guidance for DeFi Alpha revenues, on the Q4 2024 earnings call, Wattenstrom

stated that all but CDN $90-100 million of the guidance was DeFi Alpha revenues, suggesting that DeFi Alpha accounted for CDN $127-137 million—about the same as DeFi Alpha had earned in 2024. On the call, Wattenstrom emphasized that the guidance was "conservative" and did not assume growth.

91. As of December 31, 2024, none of the elements that had made the 2024 trades possible were present. Valour's largest individual holding was worth CDN $87.11 million, a fifth of the value of its Q1 2024 Solana holdings.[5] To make large profits, DeFi would have to negotiate and close DeFi Alpha trades in a half-dozen tokens. But even then, it could not make 2024-sized profits. The ***total*** value of all tokens of which DeFi held more than CDN $15 million was CDN $273.60 million, CDN $160 million less than its Q1 2024 Solana holdings.

| | Coins | Value |
|---|---|---|
| Cardano | 69.67 million | CDN $87.11 million |
| Polkadot | 2.77 million | CDN $21.15 million |
| Ripple | 1,722.40 million | CDN $27.15 million |
| HBAR | 49,61 million | CDN $19.98 million |
| ICP | 1.44 million | CDN $20.93 million |
| SUI | 10.78 million | CDN $66.00 million |
| TOTAL | | CDN $273.60 million |

92. To earn revenues of CDN $127 million, DeFi would have to find third parties who held large locked-up caches of six different tokens that exactly matched Valour's balance sheet, buy all the tokens at a near 50% discount, and sell all the freely tradable tokens. The operation

[5] Excluding Bitcoin and Ethereum. There is no mechanism to produce locked Bitcoin or Ethereum tokens.

would also be incredibly risky, since it would leave no cushion; DeFi would have to meet any redemption request from its own corporate funds. There is no conceivable way this could happen.

93. On May 14, 2025, announcing Q1 2025 results, Defendants raised guidance to CDN $285.6 million. Defendants did not provide DeFi Alpha-specific guidance but Wattenstrom stated that DeFi Alpha contributed slightly more than the initial number announced with Q4 2024 results.

94. Once again, the conditions that made the 2024 trades possible were not present. DeFi's largest individual holding was worth CDN $65.90 million and the total value of coins of which it held more than CDN $15 million was CDN $232.66 million.

| | Coins | Value |
|---|---|---|
| Cardano | 69.45 million | CDN $65.90 million |
| Polkadot | 3.10 million | CDN $18.20 million |
| Solana | 0.14 million | CDN $25.99 million |
| Ripple | 20.58 million | CDN $63.02 million |
| HBAR | 65.77 million | CDN $15.51 million |
| SUI | 13.31 million | CDN $44 million |
| TOTAL | | CDN $232.66 million |

95. To earn revenues of CDN $127 million, DeFi would have to find third parties who held large locked-up caches of six different tokens that exactly matched Valour's balance sheet, buy all the tokens at a more than 50% discount, and sell all the freely tradable tokens. The operation would also be incredibly risky, since it would leave no cushion; DeFi would have to meet any redemption request from its own corporate funds.

96. In May 2025, Defendants made a single large trade, buying 18.7 million locked-up SUI tokens at a discount and recording revenue of CDN $30.3 million (US$22 million).

97. Announcing Q2 2025 results, Defendants once again raised guidance to US$219 million from CDN $285.6 million ($201.1 million), of which US$101 million would come from DeFi Alpha trades. To reassure investors that the guidance was possible even though Alpha had only earned revenues of $17 million to date in 2025, on the call, Defendant Wattenstrom stated that DeFi had 15 Alpha trades in its pipeline, adding that DeFi's Alpha guidance assumed that only 65% of these trades would close in 2025.

98. Once again, the conditions that made the 2024 trades possible were not present. DeFi's largest individual holding was worth US$48.2 million (CDN $66.6 million) and the total value of coins of which it held more than US$10 million was US $143.1 million.

| | Coins | Value |
|---|---|---|
| Cardano | 69.94 million | USD$39.50 million |
| Polkadot | 3.10 million | USD$10.52 million |
| Solana | 0.12 million | USD$18.36 million |
| Ripple | 22.03 million | USD$48.21 million |
| HBAR | 73.37 million | USD$10.97 million |
| SUI | 8.16 million | USD$15.53 million |
| TOTAL | | USD$143.1 million |

99. To make the remaining guidance of US $85 million, DeFi would have to find third parties who held large locked-up caches of six different tokens that exactly matched Valour's balance sheet, buy all the tokens at a more than 50% discount, and sell all the freely tradable

tokens. The operation would also be incredibly risky, since it would leave no cushion; DeFi would have to meet any redemption request from its own corporate funds.

**G. DeFi Sells $100 Million of Its Artificially Inflated Stock**

100. Defendants have claimed that DeFi's low stock price informed specific strategies. For example, on the Q3 2024 earnings call, asked "will future acquisitions be paid with share dilution?", Defendant Starr categorically answered "[w]e will never use shares to make acquisitions when our valuation is trading this low [approximately $2.10]."

101. DeFi also boasted that it did not need to raise capital. For instance, at a presentation at the June 17, 2025 Maxim Group 2025 Virtual Tech Conference:

> Yeah, I think the closing remark would be that DFT stock is trading at a multiple of, I think, something like six to nine times the comparable than our industry are trading in the 30 to 40 range. And yet somehow in the Web3 space, in the digital assets space, we're one of the few that are not only profitable, we're operating cashflow positive and continue to have projections of profit. ***We don't need to raise capital in order to fund our operations. We don't need to raise capital in order to actually conduct certain strategic acquisitions.***

102. DeFi announced two share buyback programs.

103. The first, announced on June 6, 2024, covered up to 26,996,392 shares and ran from June 10, 2024 to June 9, 2025. Announcing Q2 2025 earnings, DeFi reported that it had repurchased 675,900 shares for $1.877 million, or about $2.78/share.

104. On August 22, 2025, DeFi announced a share buyback program. The August 2025 program covered up to 31,673,791 shares and ran from August 26, 2025 to August 26, 2026. Announcing the buyback, DeFi stated:

> The Company is undertaking the [buyback program] because its management believes that, currently, and from time to time, the market price of its Common Shares may not reflect the underlying value of the Company's business and prospects. Management believes that, at such times, the purchase of Common Shares for cancellation would be in the best interests of the Company's shareholders and an appropriate use of its cash on hand. The Company's current cash balance is approximately US$19.8 million.

105. On August 22, 2025, DeFi's stock closed at $2.24/share.

106. On social media, DeFi's head of Investor Relations Curtis Schlaufman explained that DeFi would continue to repurchase its shares and that buying might accelerate once DeFi earned cash from DeFi Alpha transactions.




107. On September 8, 2025, Defendants announced that DeFi had purchased 80,000 shares to date pursuant to the August 2025 repurchase round.

108. On September 4, 2025, DeFi filed a Shelf Registration for the offering of DeFi securities of any type at any time in the next 25 months. Announcing the filing, DeFi reassured investors that it had no plans to sell stock (or any other security):

> The Company has filed the Base Shelf Prospectus and Registration Statement to maintain financial flexibility, ***but has no present intention to undertake an offering of securities under the Base Shelf Prospectus.***

109. On September 25, 2025, DeFi announced that it was selling 45,662,101 shares to investors for $2.19/share, for a total of $100 million before commissions of $6 million. That is already $0.59/share lower than the average Q2 2025 purchase price. Moreover, the share was not the only thing of value investors received for their $2.19; they also received three quarters of a warrant to purchase one share for $2.63, exercisable upon issuance and expiring in 3 years.

## V. LOSS CAUSATION

110. Defendants' false statements created a misleading impression that DeFi Alpha's 2024 revenues were repeatable. During 2025, it became clearer and clearer that DeFi Alpha would not repeat its 2024 results. At the same time, Defendants dribbled out information about DeFi Alpha's trading strategy that gradually revealed its limited scope. These revelations caused DeFi's stock price to fall.

111. The first disclosure came in a monthly report. DeFi published monthly operational reports. These reports usually included information on DeFi Alpha revenues.

112. On July 7, 2025, DeFi published its report for June 2025. Therein, DeFi stated that DeFi Alpha had generated CDN $155.9 million since inception—CDN $6.9 million less than it had reported as of the close of May 2025—showing that Alpha had not earned any revenues in June.[6]

113. On July 7, DeFi's stock price fell from its previous close of $3.14 to close at $2.81, down $0.33 (11.1%).

114. On August 15, 2025, DeFi held a call to discuss Q2 2025 earnings. On the call, Defendants stated that they could not guarantee that DeFi Alpha trades would even take place in 2025:

> Q: Hi, guys. Thanks for taking my questions here, and we appreciate all the additional color on the guidance. I just kind of wanted to hone in on, I guess, DeFi Alpha. You talked about how this year, some of these deals are taking a little bit longer than initially expect at least the first half of the year. I guess, what kind of gives you conviction that this can all kind of happen in the second half of the year? And I guess, do you see any risk that some of these deals can maybe slip into next year? Thanks.
>
> DEFENDANT NEWTON: ***It's obviously extremely hard to say if any of these deals will slip into next year.*** Obviously we are working super hard to make sure they happen within this year and sooner rather than later. And I would say each

[6] The decrease is due to accounting for locked-up tokens.

> and every of the deals we are working on -- in our pipeline, there's different triggers for all of them. There might be some who do not want to execute before the prices is at a certain level. I think we have not really forecasted to be able to do all the trades in our pipeline, but rather, I think 65% of them because it's always something that falls off. So I wouldn't say it's an overly optimistic forecast. And I wouldn't say it has necessarily taken longer time with any of these than the trades we already executed. It's always negotiations and back-and-forth and depends also a bit the appetite depends a bit on the market conditions.

115. Newton's explanation raised some skepticism amongst investors. After the call, a Compass Point analyst changed its DeFi valuation methodology. The analyst had previously based his valuation on a multiple of DeFi's revenues. Because the analyst characterized the revenues as recurring revenues, the multiple was high. But after the call, the analyst stopped valuing Alpha revenues as recurring, instead valuing Alpha based on its pipeline, reducing the analyst's price target from $6.50 to $5.00.

116. Other analysts began to express doubts. As a Northland Securities analyst wrote in an August 18 report:

> **Defi Alpha.** Recall on May 5th, DEFT announced that it executed a one-time arbitrage trade worth $22M (was revised to $17.3M for 2Q25 with rest later in year) through Defi Alpha (launched 2Q24), its specialized arbitrage trading desk. This trade was included in 2Q25 financials. While this isn't part of the core business, DEFT has been opportunistic with trades like these since launching the platform, and has generated $96.7M in revenue to date. **While only $17M in DeFi Alpha YTD, the company's guidance assumes $102M in revenue from DeFi Alpha, reflecting another ~$85M coming in 2H25, with over a dozen deals in the pipeline.** Additionally, it sounds like there is a growing pipeline of opportunities for these kinds of transactions. (emphasis in original)

117. On August 15, 2025, the price of DeFi's shares closed at $2.31, down $0.30 (12.4%) from their previous close.,

118. On September 25, 2025, DeFi announced that it was selling $100 million of its own stock. Defendants' capital raise was astounding. Defendants had claimed that DeFi's stock was undervalued and were in the middle of a stock buyback program.

119. Defendants had also claimed that DeFi did not need additional capital because of impending DeFi Alpha revenues. On the Q2 2025 earnings call taking place on August 15, 2025, Defendants had explained that they expected DeFi Alpha to generate $85 million in the remaining 5 months of 2025. DeFi Alpha trades generated copious amounts of cash. As Defendant Schlaufman had explained on social media on August 27, 2025, DeFi could use the cash these trades generated to repurchase more stock. That DeFi would need to ***raise*** $100 million at a price Defendants claimed undervalued DeFi, rather than using the $85 million it expected to earn over the next 5 months to repurchase stock, called into question whether it really would imminently earn $85 million from DeFi Alpha's operations.

120. On September 25, 2025, DeFi's stock price fell from its previous close of $2.61 to close at $2.13, down $0.48 (20.3%), damaging investors.

121. On November 14, 2025, Defendants announced DeFi's Q3 2025 earnings. Defendants also held a call to discuss DeFi's earnings.

122. On the call, Defendants lowered FY 2025 guidance from $218.6 million to $116.6 million, down 46.7%.

123. Defendants blamed DeFi Alpha for the guidance decrease. As Defendants told investors, DeFi did not expect to close any more Alpha transactions in 2025:

> Moving on to revenue bridge from our guidance. The company previously disclosed revenue guidance of $218.6 million. This consisted of $116.6 million of core revenues [and] $102 million of DeFi Alpha related revenues. DeFi Alpha opportunities have been delayed from the forecast due to the proliferation of digital asset treasury companies and the consolidation in digital asset price movements in the later half of 2025, thereby delaying arbitrage opportunities and compressing available arbitrage profits.
>
> Furthermore, given the unpredictable nature of DeFi Alpha transaction revenues, we understand most analysts were not factoring these revenues into their financial evaluation models. As such, we reiterate our core forecast of $116.6 million revenue for 2025 and guide that the $102 million of DeFi Alpha related revenues will be deferred over a longer period.

124. On the Q3 2025 earnings call, Defendants admitted that instead of hedging, they had simply been buying locked-up tokens and substituting them for tokens in their ETPs:

> Q: Do Alpha trades carry a liquidity or price liability? Could you please explain what happens with the May $23.8 million SUI trade, if prices lower or higher than $3.51 per token at maturity?
>
> Also, could you explain if and how DeFi is hedged if, for example, DeFi replaced 30% of their fee and liquid SUI tokens at their ETPs for these locked tokens in the March trade, and there is a run on 75% of the SUI? So basically, I think the question is, how are we hedged against these locked token trades, particularly if they don't realize — if they trade lower than the valuation they were acquired at at maturity?
>
> DEFENDANT NEWTON: Yes. Happy to answer that. So basically, with that trade and I think two other trades historically, as I think we've communicated before, we have hedged all market risk for the core operation. We have a part of the profit, locked in profit for this trade and two of the historical trades has been retained in tokens. So to that respect, the profits - some of the profit is locked up and in tokens.
>
> So that part of the profit will obviously fluctuate a bit with the market. We will get the higher profit if trade market goes higher and slightly lower if market goes down. Whilst the core — the arbitrage itself is 100% hedged for the principal, ***the pure profit we locked in is retained in tokens that will be locked for a bit***. So we will — we might see some volatility there over time. There's a lot of upside and some downside, but it will not — the principal of that trade is locked up and hedged away.
>
> Same thing as historically, we've seen with some of the other trades as well, where we retain some of the parts in the actual token where we did the trade. And that' s something that we are keen to do for some of the assets where we have a high conviction and where we're building, where we have products and we're happy to support those ecosystems. And we believe the upside and potential is great and we have a lot of interactions and support those ecosystem and technologies for sure.
>
> So yes, short answer, we have on the pure profit, there is a correlation to the market so it can go up or go down. And yes, I think, was there anything more specific Curtis that I missed there?
>
> DEFENDANT WATTENSTROM: Yes. So that's the difference for different trades. If we do these trades in assets where we don't have a high conviction, we typically do not have an exposure at all. ***We lock in all fiat, all profit in fiat.*** For some others, we keep some of the profit in the assets.

125. Defendants' statements revealed to investors that Alpha did not rely on complicated arbitrage models, but instead simply bought discounted locked-up tokens and sold the corresponding freely tradable tokens.

126. On November 14, 2025, DeFi's stock price fell from $1.45 to close at $1.23, down 16.5%. The next trading day, DeFi's stock price continued its decline to $1.05, down another 15.8%. In total, in two days, DeFi's stock price had fallen $0.40, or 27.6%, leaving investors with catastrophic losses.

## VI. DEFENDANTS' SPECIFIC ACTIONABLE STATEMENTS AND OMISSIONS

127. On May 15, 2024, in a press release discussing Q1 2024 results, DeFi Technologies announced that it had created a new business unit, which it called DeFi Alpha. In the press release, Defendants described DeFi Alpha as an "alpha-generating business … ***focus[ed] on arbitrage trading opportunities in the digital asset space with low risk in both centralized and decentralized markets*** … minimizing downside revenue volatility."

128. On May 21, 2024, the Company held its earnings call for the first quarter of 2024. When describing DeFi Alpha, Defendant Newton stated that "[t]he focus [of DeFi Alpha] is on arbitrage trading opportunities in the digital asset space ***with low risk in both centralized and decentralized markets with minimal or no protocol exposure thereby minimizing downside in revenue volatility***."

129. Later in the same earnings call, when Defendant Newton stated that:

> [W]e'll have more information coming online in regards to DeFi Alpha, the opportunities and positioning of our trading desk there. ***And we are constantly assessing new opportunities kind of every day as they come in.*** And I think kind of—as it's kind of fairly new, give us a few months, and we should have some better ideas on guidance and potential opportunistic kind of revenue opportunities as they present themselves.

130. On the earnings, call Defendant Starr stated, about DeFi Alpha, that:

> But from a trading desk perspective, like I said, I mean, like Johan is one of the most sophisticated long-lived crypto traders out there. His team and Oli are excellent at what they do. And all you really have to do is look at kind of Galaxy's revenue structure where actually the bulk of their revenues tend to come from trading profits, which are really hard to model out quarter-over-quarter.
>
> But because of the industry and how nascent it is, ***you do see these arbitrage opportunities appear very, very regularly where you can take low-risk our positions and capture meaningful gains.***

131. The foregoing emphasized statements were false because: (1) DeFi Alpha was not focused on "opportunities," because at the time DeFi Alpha consisted of just one trade with FTX that had depended on an extraordinary confluence of events; and (2) arbitrage opportunities did not appear "regularly," instead, they had appeared only once. In sum, Defendants' statements gave investors the misleading impression that they had developed repeatable and sophisticated trading strategies when, in truth, they had employed a single strategy that exposed DeFi to significant risk and depended on an extraordinary coincidence that was unlikely to recur at scale. Moreover, in so doing, they had exhausted their cache of freely tradable Solana and Avalanche tokens, leaving no tokens with which DeFi could repeat a large-scale DeFi Alpha trade.

132. On August 15, 2024, the Company held its earning call for the second quarter of 2024. Defendant Newton stated that "DeFi Alpha's kind of sole focus is ***identifying low-risk arbitrage opportunities within the ecosystem***, which kind of, as most people have seen, ***generated just over CAD133 million this quarter. And we're kind of just getting started with that business***."

133. Similarly, discussing the Company's new products, Newton stated:

> New website for Valour is now live and also DeFi Technologies website is rolling out over the course of the next few weeks to basically give shareholders and potential investors more information about all of our different subsidiaries that we're launching and will continue to launch, ***such as DeFi Alpha, which is very new but has made a new foundational impact on where we're headed as a business. And I think we're just scratching the surface***.

134. Defendants' emphasized statements were false because: (1) Defendants had not explored "opportunities," but instead had engaged in a single trade that was only possible because of an extraordinary confluence of events; (2) Defendants were not "just getting started" or "scratching the surface" with DeFi Alpha, but instead, had exhausted DeFi Alpha's current possibilities, because they no longer had the massive CDN $430 million in freely tradable Solana tokens that had made DeFi Alpha possible; (3) DeFi Alpha's impact was not "foundational" because it relied on an extraordinary coincidence that was not likely to recur at scale; and (4) DeFi Alpha was not repeatable and foundational for the additional reason that DeFi had exhausted its Solana and Avalanche caches in completing the DeFi Alpha trade.

135. Additionally, in response to an analyst's question as to "how does a larger balance sheet impact your DeFi Alpha strategy" Defendant Wattenstrom said:

> Yes. To put DeFi Alpha into context, obviously, we have now more structure, the treasury and balance sheet management function. And part of that is to allocate the resources, balance sheets and liquidity among market making, liquidity provision, treasury model portfolio, the DeFi Alpha, ***both the systematic trading opportunities and the more super high margin one-off ones. I say one-off, but we have a lot of one-off ones continuously, hopefully, even in the future***.
>
> ***So, obviously, the growing balance sheet and the increased liquidity allows us now to be part of a lot of different new trading strategies where we couldn't participate before. A lot of these are not really accessible for a lot of competitors***. I don't want to go into too much detail there, but yeah, the answer is yes. Also, the balance sheet and the liquidity allows a lot of other strategies that we haven't really even gotten into yet, but are a better thing and will be able to execute on the back of that. So it's synergistic for sure.

136. Wattenstrom's emphasized statements were false because: (1) there were no "systematic" or "continuous[]" "trading opportunities" but only a single opportunistic trading strategy that had thus far resulted in a single lucky trade; (2) DeFi Alpha was indeed a one-off trade, so Wattenstrom's statement denying as much was false; (3) the DeFi Alpha trade was accessible to DeFi's competitors because it was completed through a widely-publicized public

auction that drew numerous bids. In sum, Defendants' statements gave investors the misleading impression that they had developed repeatable and sophisticated trading strategies when, in truth, they had employed a single strategy that exposed DeFi to significant risk and depended on an extraordinary coincidence that was unlikely to recur at scale. Moreover, in so doing, they had exhausted their cache of freely tradable Solana and Avalanche tokens, leaving no tokens in which DeFi could repeat a large-scale DeFi Alpha trade.

137. On or before August 15, 2024, DeFi Technologies posted a description of DeFi Alpha on its website. The description provided, in relevant part:

> DeFi Alpha, a specialized arbitrage trading desk under DeFi Technologies, is designed ***to identify and capitalize on low-risk arbitrage opportunities within the cryptocurrency market***. Utilizing ***sophisticated algorithmic strategies*** and ***comprehensive market analysis***, DeFi Alpha ***targets inefficiencies and discrepancies*** in digital asset pricing to [sic]

138. In the filings listed in this footnote,[7] the Company described DeFi Alpha as:

> [A] specialized arbitrage trading desk with the sole focus [sic] ***is to identify low-risk arbitrage opportunities*** within the crypto ecosystem. The Defi Alpha trading desk is strategically designed to focus on ***identifying and capitalizing upon arbitrage opportunities within the dynamic digital assets market. Utilizing advanced algorithmic strategies and in-depth market analysis, the trading desk aims to generate alpha by exploiting inefficiencies and discrepancies in digital asset pricing***. The primary focus is on arbitrage trading opportunities in both centralized and decentralized markets, ensuring ***minimal market or protocol exposure to mitigate downside revenue volatility.***

139. The emphasized statements were false because: (1) DeFi Alpha did not "identif[y] and capitaliz[e] on" "opportunities," because it consisted of a single lucky trade using a single trading strategy; (2) DeFi Alpha did not employ algorithmic strategies, let alone sophisticated ones; (3) DeFi Alpha did not employ comprehensive market analysis, it simply placed a bid in a

---

[7] MD&A for the quarters ending June 30, 2024, September 30, 2024, March 31, 2025, and June 30, 2025; Amended & Restated MD&A for the quarters ended June 30, 2024, and September 30, 2024; MD&A for the year ended December 31, 2024.

widely-publicized auction; (4) DeFi Alpha did not "target inefficiencies and discrepancies" in digital asset pricing because it merely bought tokens that were discounted because they could were locked up; (5) DeFi Alpha's trading was not "low-risk" because it exposed DeFi to a potential catastrophic run that could push DeFi into bankruptcy. In sum, Defendants' statements gave investors the misleading impression that they had developed repeatable and sophisticated trading strategies when, in truth, they had employed a single strategy that exposed DeFi to significant risk and depended on an extraordinary coincidence that was unlikely to recur at scale. Moreover, in so doing, they had exhausted their cache of freely tradable Solana and Avalanche tokens, leaving no tokens in which DeFi could repeat a large-scale DeFi Alpha trade.

140. On November 14, 2024, Defendant Schlaufman posted to ceo.ca, a social media website, to explain DeFi Alpha's trading strategy, stating:

> For further clarity - Arbitrage trading is a strategy that capitalizes on price discrepancies between different markets or platforms. ***For simplicity, if Bitcoin is priced at $0.90 on one exchange and $1.00 on another, an arbitrage opportunity arises. By purchasing Bitcoin at $0.90 and selling it at $1.00, a trader can realize a profit from the price differential without exposure to market volatility. This form of trading is highly effective at generating risk-free gains by swiftly leveraging mispriced or discounted opportunities. Our DeFi Alpha strategy has resulted in no losses due to disciplined risk management and effective execution of these arbitrage opportunities. DeFi Alpha generated US$83.4 Million in Q2 and already reported a US$14.1 Million gain in Q3>*** This approach has significantly contributed to the company's strong financial health, allowing us to pay off more than $30 million in debt since May and over $50 million within the past year while embarking on a digital asset treasury strategy.

141. Defendant's emphasized statements were false because: (1) DeFi Alpha did not employ arbitrage as Defendant Schlaufman described it because its sole strategy was to purchase locked-up tokens, substitute them for freely tradable tokens, and hope that not too many investors redeemed their ETPs; (2) DeFi Alpha did not exploit price differences in different markets, or in any other way leverage discrepancies, but instead consisted of a trade in a single trading strategy that did not involve arbitrage, had only occurred once, and was unlikely to recur at scale; (3) DeFi

Alpha's trading was not "swift," in that it involved multi-year holding periods; (4) DeFi Alpha's trading was not "risk free," in that it entailed a catastrophic liquidity risk; (5) Defendants' statements gave investors the impression that DeFi Alpha's trades were repeatable; and (6) in fact, there was no chance that Defendants would repeat the 2024 DeFi Alpha trades at the same scale.

142. On November 15, 2024, the Company held a call to discuss Q3 2024 earnings. When discussing DeFi Alpha, Defendant Newton stated:

> De Fi Alpha, our rather new business unit compromising [sic] around trading activities, which has been off to a great start. And I know we get a lot of questions about guidance and how often, how frequently we see the kind of perpetual or nature of our training occur, which we'll touch on a little bit later within the presentation that ***we are—we—it's important to note that we don't—we don't take any risk at DeFi Alpha. So, there's never losses and things of that nature, but we are kind of algorithmically and with human intervention always assessing trades*** and hope to have a few more under our belt to be able to provide, I would say, the—our shareholders a better glimpse of what that looks like kind of going into the future.

143. Later in the call, Defendant Newton also stated:

> ***I would say a lot of the trades we do are not open for any firm to just jump in and do prop trading***. I've been doing, obviously, prop trading systematic and optimistic the last 10 years in crypto. And within these areas, nothing has much changed here. What has changed is our balance sheet, our flows, our liquidity, and our opportunity ***to efficiently go after opportunities that not very many competitors can actually even execute if they wanted to. So, I think we both on the systematic side and the opportunistic side, we see no change in this in the near future.*** But rather, the growth of the ecosystem, the growth of mainstream adaptation, ***and so on, just gives us more and more opportunities, more than we actually have time to look at in spite of our growing bandwidth and focus on this area***. So, yes, for a near-term future -- I don't see that change anytime soon.

144. The emphasized statements were false because: (1) DeFi Alpha did not employ algorithmic strategies; (2) DeFi Alpha did take risks because trades exposed DeFi to a potential catastrophic run that could push DeFi into bankruptcy; (3) DeFi Alpha's trading was easy to duplicate and, moreover, all of DeFi Alpha's revenues to date resulted from placing a bid in a well-publicized auction that had been open to the public, having been excluded from the

opportunity afforded to crypto industry insiders to purchase tokens at a lower price; (4) Defendants' statements gave investors the impression that DeFi Alpha's trades were repeatable; and (5) DeFi itself did not have any opportunities to repeat the DeFi Alpha trades because in completing the initial trade, it had exhausted its cache of freely tradable Solana and Avalanche tokens.

145. In that same earnings call, asked why the guidance for Q4 2024 was so much higher than Q3, Defendant Wattenstrom stated:

> This is a big variety of factors. Obviously, part of this is that we were quite conservative for the full year guidance earlier, and obviously, we have much higher market levels. We have much higher AUM right now. We have a much better product mix right now, which drives our monetization rate much higher. I think we were at CAD8.2 million or something of the AUM in Q3. We see that going higher in Q4, along with the AUM, along with the new products we have launching, ***and also along with the DeFi Alpha strategies that we are now scaling up as well. It's obviously hard to guide on any opportunistic trades, one-off trades, so we haven't included those in these numbers***, but we are looking very closely at the opportunities we hope to conclude before the year end. But this is mainly driven by the growth of AUM. ***We see the growth in monetization and the systematic activities within DeFi Alpha***, and the usually improved product mix within our AUM portfolio. Also, there are a few opportunities we are -- we will enable with the launch of these 23 new products within two to three weeks that will help to drive the revenues in 04.

146. When describing Alpha revenue generation, Defendant Wattenstrom also stated:

> ***[O]bviously, we have also the systematic trading and the rationale for forming DeFi Alpha was also to make the monetization of the balance sheet in total, both fiat and crypto assets, much more efficient and drive the monetization rates***. So, within that context, without taking any market exposure, ***we see a lot more opportunities now in Q4 in terms of all the arbitrages and short-term transactions that actually doesn't affect our exposure.*** But what we couldn't do earlier in that low turnover, lower AUM environment, so both the flow and increased AUMs and decreased number of assets are driving our opportunities we see and the opportunities we engage in at the moment and going forward throughout Q4.
>
> ***So it's not just going after one-off trades. It's also about building the infrastructure that we've been focusing on a lot since Q2. We have increased the bandwidth quite a lot in the team in regards to both development of infrastructure, agreements with counterparties, and the focus and the research***

> ***into these opportunities. So, it's very hard to be very specific about this early on because obviously, it's something that is an immense growth in our ability to participate here during this quarter and last quarter.***

147. The emphasized statements were false because: (1) DeFi Alpha did not have "strategies," rather, it was a single trade that DeFi had only ever pulled off once; (2) for the same reason, DeFi Alpha did not have any "systematic activities" or "systematic trading,"; (3) DeFi Alpha simply did not have the token capacity to engage in substantial DeFi Alpha trades; (4) Defendants' statements gave investors the impression that DeFi Alpha's trades were repeatable; (5) DeFi Alpha strategies were not "scaling up" because DeFi had exhausted the Solana and Avalanche tokens that had made DeFi Alpha's trade possible.

148. On March 31, 2025, the Company issued a press release announcing its financial results for the fourth quarter of 2024 and the full year of 2024, and 2025 revenue guidance of CDN$227.2 million (US$159.9 million).

149. In the press release, describing DeFi Alpha, Defendants stated:

> **Strategic Focus and Competitive Edge:** DeFi Alpha was designed to ***capitalize on the Company's balance sheet through both systematic and opportunistic trading strategies.*** The approach uniquely positions DeFi Alpha to take advantage of market opportunities while leveraging its balance sheet advantages. Many of the trades pursued are exclusive, ***backed by strong partnerships and significant holdings tied to ETPs, making these opportunities largely inaccessible to other firms.*** This exclusivity, combined with efficient execution in low-competition areas, is what gives DeFi Alpha its strategic edge in the market.
>
> **Systematic Earnings and Opportunistic Trades:**
>
> - **Systematic Strategies**: ***Focus on low-risk, model-driven arbitrage and short-term opportunities that do not expose the company to broader market fluctuations. These trades remain highly effective, providing steady and predictable earnings.***
> - **Opportunistic Trades**: These trades, ***often linked to partnerships and liquidity advantages***, are a critical part of the strategy but are inherently harder to predict or guide on a quarterly basis. Despite this unpredictability, they remain an important growth avenue for DeFi Alpha.

***

**Outlook for 2025 and Beyond**: Looking ahead, DeFi Alpha is poised to capitalize on its unique positioning, ***leveraging both systematic and exclusive trading opportunities, along with strong partnerships and continued market growth***. At the same time, the ongoing infrastructure investments will ensure a solid foundation for long-term success, with sustained growth and continued strategic advancements as key focuses for 2025.

150. On the earnings call held the same day, Defendant Wattenstrom stated as to Alpha:

We have chosen to be quite conservative on the DeFi Alpha side***. We have quite an aggressive growth of our pipeline of deals and – but it's very hard to pin down exactly when they go through. What we anticipate a strong quarter within that business. And then it is harder to know, exactly how many deals we'll do at what month***, but these are, are the different trends we've been taking into this.
But we're trying to be quite conservative as the market at the moment. We obviously we are very bullish on the crypto market as such ahead of the next few quarters, but we haven't actually baked those into those assumptions and projections for the year.

151. Later in the Q4 2024 earnings, call Defendant Wattenstrom further stated, about DeFi Alpha:

***The other part here, which is more consistent on a day-to-day basis, is the more model-driven type of arbitrage strategies, which are kind of integrated with our daily flow management and also the management of our balance sheet in terms of monetization of our full balance sheet, including liquidity, digital assets and support, which gives us quite a unique position to take advantage of a lot of both arbitrage and other type of model-driven strategies***. We built out and continue to build out the infrastructure and models quite a lot in this area. So, that's one part of it, that we see strong growth in. And the other part is obviously that we're focusing a lot on growing the exposure to and the pipeline of deals similar to what we were able to do last year. And we're really optimistic about the full year and also next quarter in these terms.

***So, yes, we believe this will still be probably half of the revenues going forward for the next year, at least.*** And growing long term -- and also that this is, I would say, these type of trades are more uncorrelated to the core business cash flow we see from the optimization of the monetization of our AUM and the rest of our assets on the balance sheet.

152. On that same earnings call Defendant Newton said "[a]nd just want to emphasize ***there are two parts to DeFi Alpha. It's the larger trades that we've seen, but also we have the daily systematic arbitrage*** through our daily flows that we see through our products."

153. After the call, on March 31, 2025, Defendant Schlaufman further emphasized Defendants' claim that DeFi Alpha included daily arbitrage:

> We also arb our trade flows. ***Tried to make that very clear on the call that yes, there are exclusive arb deals we get access to but we also have daily arb in our trade flows/ops. It was also clearly stated we have several deals lined up in the near term.***

154. Later that same day, Defendant Schlaufman posted on ceo.ca that "there were 3 big trades in 2024. But we also have model driven arb/flow monetization that accounts as revenue for the asset management/Valour biz - that we do not PR because it happens every day."

155. Defendant Schlaufman added that:

> DeFi Alpha was created to focus on monetizing the balance sheet through ***systematic and opportunistic strategies, addressing both growing market opportunities and unique balance sheet advantages***. Many of the trades and opportunities pursued are exclusive due to strong partnerships and significant holdings tied to ETPs, making them inaccessible to most other firms. The ability to execute efficiently in areas with no meaningful competition underpins DeFi Alpha's strategic edge.
>
> * * * * *
>
> Investments in infrastructure, counterparty agreements, and research since Q2 are laying the foundation for sustained growth, with the full benefits expected to materialize in the next year (2025). DeFi Alpha is poised to ***capitalize on its unique positioning, leveraging systematic and exclusive trading opportunities***, strong partnerships, and market growth to drive significant revenue in the short term while building a foundation for long-term success.

156. The emphasized statements were false because: (1) DeFi Alpha did not include multiple strategies (opportunities and systematic) because it consisted of a single opportunistic trading strategy; (2) DeFi Alpha did not employ any model-driven, short-term, steady and predictable systematic strategies; (3) as to opportunistic trades, the single DeFi Alpha trade Defendants had been able to complete to date required on an extraordinary confluence of events; (4) in completing that trade, DeFi Alpha had exhausted its supply of Solana and Avalanche tokens, ensuring that any future DeFi Alpha trade would have to be much smaller; and, so (5) DeFi did

not have balance sheet advantages, instead it had a severely constrained balance sheet; and (6) as a result, DeFi's Alpha-related guidance was not achievable.

157. On May 14, 2025, the Company issued a press release announcing DeFi's financial results for the first quarter of 2025, raising 2025 revenue guidance to CDN$285.6 million (US$201.1 million).

158. In that press release when describing Alpha the Company said that:

> **Strategic Focus and Competitive Edge:** DeFi Alpha was designed to ***capitalize on the Company's balance sheet through both systematic and opportunistic trading strategies.*** The approach uniquely positions DeFi Alpha to take advantage of market opportunities while leveraging its balance sheet advantages. Many of the trades pursued are exclusive, ***backed by strong partnerships and significant holdings tied to ETPs, making these opportunities largely inaccessible to other firms.*** This exclusivity, combined with efficient execution in low-competition areas, is what gives DeFi Alpha its strategic edge in the market.
>
> **Systematic Earnings and Opportunistic Trades:**
>
> - **Systematic Strategies**: ***Focus on low-risk, model-driven arbitrage and short-term opportunities that do not expose the company to broader market fluctuations. These trades remain highly effective, providing steady and predictable earnings.***
> - **Opportunistic Trades**: These trades, ***often linked to partnerships and liquidity advantages***, are a critical part of the strategy but are inherently harder to predict or guide on a quarterly basis. Despite this unpredictability, they remain an important growth avenue for DeFi Alpha.
>
> ***
>
> **Outlook for 2025 and Beyond**: Looking ahead, DeFi Alpha is poised to capitalize on its unique positioning, ***leveraging both systematic and exclusive trading opportunities, along with strong partnerships and continued market growth***. At the same time, the ongoing infrastructure investments will ensure a solid foundation for long-term success, with sustained growth and continued strategic advancements as key focuses for 2025.

159. The emphasized statements were false because: (1) DeFi Alpha did not include multiple strategies (opportunities and systematic) because it consisted of a single opportunistic trading strategy; (2) DeFi Alpha did not employ any model-driven, short-term, steady and

predictable systematic strategies; (3) the single DeFi Alpha trade Defendants had been able to complete to date required an extraordinary confluence of events; (4) in completing that trade, DeFi Alpha had exhausted its supply of Solana and Avalanche tokens, ensuring that any future DeFi Alpha trade would have to be much smaller; and, so (5) DeFi did not have balance sheet advantages, instead it had a severely constrained balance sheet; and (6) as a result, DeFi's Alpha-related guidance was not achievable.

160. On August 14, 2025, DeFi published a press release announcing Q2 2025 financial results and "raising its guidance and now expects to generate approximately US$218.6 million in annualized operating revenue for 2025."

161. In the press release, describing DeFi Alpha, Defendants stated:

> **Strategic Focus and Competitive Edge:** DeFi Alpha was designed to ***capitalize on the Company's balance sheet through both systematic and opportunistic trading strategies.*** The approach uniquely positions DeFi Alpha to take advantage of market opportunities while leveraging its balance sheet advantages**.** ***Many of the trades pursued are exclusive, backed by strong partnerships and significant holdings tied to ETPs, making these opportunities largely inaccessible to other firms.*** This exclusivity, combined with efficient execution in low-competition areas, is what gives DeFi Alpha its strategic edge in the market.
>
> **Systematic Earnings and Opportunistic Trades:**
>
> - **Systematic Strategies**: ***Focus on low-risk, model-driven arbitrage and short-term opportunities that do not expose the company to broader market fluctuations. These trades remain highly effective, providing steady and predictable earnings.***
> - **Opportunistic Trades**: These trades, often linked to partnerships and liquidity advantages, are a critical part of the strategy but are inherently harder to predict or guide on a quarterly basis. Despite this unpredictability, they remain an important growth avenue for DeFi Alpha.
>
> ***
>
> **Outlook for 2025 and Beyond**: Looking ahead, DeFi Alpha is poised to capitalize on its unique positioning, ***leveraging both systematic and exclusive trading opportunities, along with strong partnerships and continued market growth***. At the same time, the ongoing infrastructure investments will ensure a solid

> foundation for long-term success, with sustained growth and continued strategic advancements as key focuses for 2025.

162. The emphasized statements were false because: (1) DeFi Alpha did not include multiple strategies (opportunities and systematic) because it consisted of a single opportunistic trading strategy; (2) DeFi Alpha did not employ any model-driven, short-term, steady and predictable systematic strategies; (3) the single DeFi Alpha trade Defendants had been able to complete to date required on an extraordinary confluence of events; (4) in completing that trade, DeFi Alpha had exhausted its supply of Solana and Avalanche tokens, ensuring that any future DeFi Alpha trade would have to be much smaller; and, so (5) DeFi did not have balance sheet advantages, instead it had a severely constrained balance sheet; and (6) as a result, DeFi's Alpha-related guidance was not achievable.

## VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A. Wattenstrom's CDN $37.3 Million Bonus Provides Evidence of Scienter

163. Wattenstrom's bonus provided him a potent motive to make false statements. Wattenstrom received a CDN $37.3 million bonus. Defendants justified the bonus by claiming that DeFi Alpha's 2024 performance was repeatable and that it took great skill so that Wattenstrom had to be well compensated to remain at DeFi. Had Defendants admitted that DeFi Alpha consisted of a single unrepeatable trade, they might not have been able to pay Wattenstrom his bonus.

164. Moreover, because Wattenstrom personally received the DeFi Alpha bonus, he must have been personally involved in and responsible for DeFi Alpha's operations, giving him knowledge of facts contradicting his claim.

**B. DeFi Alpha Was One of DeFi's Core Operations**

165. DeFi Alpha accounted for half of DeFi's 2024 revenues. DeFi's 2025 revenue guidance assumed that half of DeFi's 2025 revenues would result from DeFi Alpha.

166. Defendants specifically referenced DeFi Alpha in their argument to investors that DeFi was undervalued.

167. Moreover, as further set out above, Defendants used the stock bump they created by pumping DeFi Alpha to raise DeFi's stock price above $2, permitting a NASDAQ listing.

**C. Defendants' Repeated Statements About DeFi Alpha Are Probative of Scienter**

168. Defendants' statements to investors evinced familiarity with DeFi Alpha's operations.

169. Wattenstrom discussed DeFi Alpha on every DeFi earnings call beginning with Q1 2024.

170. Starr served as Head of Capital Markets during the Class Period and participated in investor-facing communications concerning DeFi Alpha. He told investors that crypto arbitrage opportunities appeared "very, very regularly," that DeFi could take low-risk arbitrage positions and capture meaningful gains, and that DeFi Alpha supported a higher valuation for the Company.

**D. Schlaufman Publicly Provided A False Description of DeFi Alpha's Operations**

171. As further set out above, in explaining DeFi Alpha's trading practice, Defendant Schlaufman told investors that arbitrage consisted of finding and exploiting discrepancies in pricing in different markets. DeFi Alpha did not engage in any such trading practices.

172. Moreover, Schlaufman's explanation shows that he understood what arbitrage was. Thus, he knew that DeFi Alpha was not an "arbitrage trading desk."

**E. False Exculpatory Statements**

173. Defendants' post-Class Period statements further support scienter. On the Q3 2025 earnings call, Defendants admitted that DeFi would not meet its prior revenue target. But Defendants did not admit the truth: that Alpha had never been a systematic arbitrage desk capable of generating recurring profits. Instead, Defendants blamed external factors, including market conditions, counterparties, delays, digital asset price movements, and the proliferation of digital asset treasury companies.

174. Those explanations were exculpatory and misleading. The core problem was not merely timing or market conditions. The core problem was that DeFi Alpha's historical profits came from locked-token trades that depended on unusual circumstances, token capacity, and distressed sellers. By attributing the shortfall to external factors, Defendants attempted to preserve the false impression that Alpha was a real, repeatable arbitrage business whose opportunities had merely been delayed.

## VIII. AGENCY

175. DeFi is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common-law principles of agency because the wrongful acts complained of herein were carried out within the scope of their employment or agency for DeFi. The challenged statements were made in DeFi's press releases, earnings calls, MD&A filings, investor presentations, and investor-facing communications, all for the purpose of communicating DeFi's business, financial results, revenue guidance, valuation, and prospects to investors.

176. The scienter of the Individual Defendants and other employees and agents of DeFi is similarly imputed to the Company under *respondeat superior* and agency principles. Newton was DeFi's Chief Executive Officer and Executive Chairman throughout the Class Period. Starr

was DeFi's Head of Capital Markets and a former Chief Executive Officer and Executive Chairman. Wattenstrom was DeFi's co-founder, former Chief Operating Officer, frequent investor call participant, and the executive most closely associated with Alpha. Schlaufman was DeFi's Vice President of Marketing and Communications and handled investor-facing communications concerning Alpha. Each acted within the scope of his role when making or disseminating the challenged statements.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

177. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired DeFi Technologies common stock during the Class Period, and held the stock through at least one of the corrective disclosures identified in ¶¶110-126 herein ("Class"). Excluded from the Class are Defendants, the officers and directors of DeFi Technologies, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

178. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DeFi Technologies securities were actively traded on the NASDAQ or over the counter. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members of the proposed Class.

179. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

180. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

181. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of DeFi Technologies;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused DeFi Technologies to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of DeFi Technologies securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

182. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. PRESUMPTION OF RELIANCE

183. In addition, common issues of fact and law predominate over individual issues. In particular, to avoid individual proof of reliance, Plaintiff invokes, in part, the presumption of reliance established by the fraud-on-the-market doctrine in that:

- DeFi Technologies securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market, and before that was traded OTC and on several different foreign exchanges;
- DeFi Technologies' securities were liquid and traded with moderate to heavy volume during the Class Period;
- As a regulated issuer, DeFi Technologies filed periodic public reports with the SEC, Canadian regulators, and the NASDAQ;
- DeFi Technologies regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Unexpected material news about DeFi Technologies was rapidly reflected in and incorporated into its stock price during the Class Period.

184. As a result of the foregoing, the market for DeFi Technologies' securities promptly digested current information regarding DeFi Technologies from all publicly available sources and reflected such information in the price of DeFi Technologies' securities. Under these circumstances, all purchasers and acquirers of DeFi Technologies securities during the Class Period suffered similar injury through their purchase or acquisition of DeFi Technologies securities at artificially inflated prices and the presumption of reliance applies.

185. Further, at all relevant times, Plaintiff and all other Class members reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiff and the other Class members would not have purchased or otherwise acquired DeFi Technologies securities at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## XI. COUNT I

**Violations of Section 10(b) and Rule 10b-5**
**Against All Defendants**

186. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187. Plaintiff asserts this claim against Defendants based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

188. Defendants made the allegedly false statements alleged herein.

189. Defendants DeFi, as well as individual defendants Wattenstrom, Newton, Starr, and Schlaufman, and other senior DeFi Technologies officers and employees, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendants' statements directly affected the price of DeFi Technologies securities during the Class Period.

190. Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of DeFi Technologies were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

191. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of DeFi Technologies securities during the Class Period in purchasing or otherwise acquiring DeFi Technologies securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

192. Had Plaintiff and the other members of the Class been aware that the market price of DeFi Technologies securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased or otherwise acquired DeFi Technologies securities at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase or acquisition of DeFi Technologies securities during the Class Period.

193. This action was filed within five years of each of Defendants' fraudulent statements and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## XII. COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

194. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

195. During the Class Period, the Individual Defendants participated in the operation and management of DeFi Technologies, and conducted and participated, directly and indirectly, in the conduct of DeFi Technologies' business affairs. Because of their senior positions, they knew the adverse non-public information about DeFi Technologies' operations.

196. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DeFi Technologies' operations, and

to correct promptly any public statements issued by DeFi Technologies which had become materially false or misleading.

197. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DeFi Technologies disseminated in the marketplace during the Class Period concerning DeFi Technologies' operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DeFi Technologies to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DeFi Technologies within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DeFi Technologies securities.

198. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DeFi Technologies.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 12, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Horne*
Jonathan Horne
Phillip Kim
Laurence Rosen
Henry Bloxenheim
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
jhorne@rosenlegal.com
philkim@rosenlegal.com
lrosen@rosenlegal.com
hbloxenheim@rosenlegal.com

*Lead Counsel for Plaintiff and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all attorneys of record.

Respectfully submitted,

*/s/ Jonathan Horne*
Jonathan Horne