**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne
Phillip Kim
Laurence M. Rosen
Henry Bloxenheim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: hbloxenheim@rosenlegal.com

*Lead Counsel for the Putative Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAIME ROMERO, BLAKE LEONARD, and THOMAS IERUBINO Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DEFI TECHNOLOGIES INC., JOHAN WATTENSTROM, OLIVIER ROUSSY NEWTON, RUSSELL STARR, and CURTIS SCHLAUFMAN,<br><br>Defendants. | **CASE No.: 1:25-cv-06637 (NRM)(SDE)**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS**<br><br>**<u>CLASS ACTION</u>** |

## TABLE OF CONTENTS

Pages


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES AND IMPORTANT NON-PARTIES ..... 7

IV. DEFENDANTS CLAIM A ONE-TIME FTX WINDFALL IS A RECURRING BUSINESS ..... 9

A. Defendants Claim They Have Created A New Sophisticated Arbitrage Trading Desk That Conducts Both Systematic Trading and Regular Large-Scale Trades ..... 10

**B. The Only Novel Portion of DeFi Alpha Was A Transaction With the FTX Estate** ..... 12

1. A Fire Sale Creates a Once-In-A-Lifetime Windfall ..... 12

2. DeFi Alpha's Locked Token Strategy Is Risky, Has Limited Scope, and Is Easy for Competitors to Replicate ..... 18

**C. Defendants Rebrand Valour's Existing Flow and Liquidity Functions as a New Systematic Arbitrage Engine** ..... 20

**D. Defendants Benefit From Claims About DeFi Alpha's Repeatability** ..... 22

1. Wattenstrom Makes $26.3 million From DeFi Alpha Trades ..... 22

2. Defendants Continue to Tout DeFi Alpha In 2025 To List on the NASDAQ ..... 24

**E. Defendants Cite Purported DeFi Alpha Transactions So They Can Complete a $100 Million Offering To Obtain the Cash the Transactions Were Supposed to Generate** ..... 25

1. Defendants' Token Holdings Are Not Sufficient to Repeat DeFi Alpha's 2024 Trading Returns ..... 25

**2. Defendants Tout Illusory Deals to Meet Guidance** ..... 27

**3. DeFi Sells $100 Million of Its Artificially Inflated Stock** ..... 31

4. DeFi Announces Just One More Deal and Removes DeFi Alpha Forecasts ..... 34

V. LOSS CAUSATION ..... 35

VI. DEFENDANTS' SPECIFIC ACTIONABLE STATEMENTS AND OMISSIONS ..... 40

A. Defendants' Statements Attributing DeFi Alpha Revenues to Systematic Arbitrage Trading and Claiming that DeFi Alpha's Strategy Was Low Risk ..... 40

B. Defendants' Statements About the Repeatability of Locked Token Trades and Competition ..... 48

C. False Statements that DeFi Alpha Was Negotiating 15 Deals as of August 15, 2025 ... 52

VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ... 53

**A. Wattenstrom's $26.3 Million Bonus Attributed to DeFi Alpha Supports Scienter** ... 53

**B. DeFi Alpha Was One of DeFi's Core Operations** ... 53

**C. Defendants' Repeated Statements About DeFi Alpha Are Probative of Scienter** ... 54

**D. Schlaufman Publicly Provided A False Description of DeFi Alpha's Operations** ... 54

**E. Defendants' False Exculpatory Statements Support Scienter** ... 55

**F. Wattenstrom's Statements on the Q2 2025 Earnings Call Were Precise** ... 56

**G. DeFi's Capital Raise Supports Scienter** ... 57

**H. Defendant Wattenstrom Was Personally Responsible for DeFi Alpha** ... 57

**I. DeFi Was a Small, Tightly Integrated Company** ... 57

**J. Defendants All Acted With Scienter** ... 58

VIII. AGENCY ... 59

IX. PLAINTIFFS' CLASS ACTION ALLEGATIONS ... 60

X. PRESUMPTION OF RELIANCE ... 62

XI. COUNT I ... 64

XII. COUNT II ... 65

XIII. PRAYER FOR RELIEF ... 66

Lead Plaintiff Jaime Romero, and Named Plaintiffs Blake Leonard and Thomas Ierubino (collectively "Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants DeFi Technologies, Inc., Johan Wattenstrom, Olivier Roussy Newton, Russell Starr, and Curtis Schlaufman ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I. INTRODUCTION[1]

1. This is a class action brought on behalf of persons or entities who acquired publicly traded DeFi Technologies stock on the OTCQB from May 15, 2024 through May 11, 2025 in the United States or on the NASDAQ from May 12, 2025 through November 13, 2025, all dates inclusive ("Class Period"), and who held such shares through at least one of the corrective disclosures identified below, bringing claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2. In mid-2024, through extraordinary luck, DeFi found itself with CDN $430 million of freely tradable Solana tokens just as crypto exchange FTX was auctioning off tens of millions of locked-up Solana tokens at a discount. Defendants subscribed to well-publicized investment vehicles that bought FTX's tokens in a public auction, substituting them for DeFi's freely tradable tokens, and selling the freely tradable tokens. Though the trade required an unlikely triple coincidence, Defendants claimed that it was repeatable systematic arbitrage. Through these false statements, Defendants secured a NASDAQ listing, a $100 million offering, and, for Defendant Wattenstrom, a $26.3 million bonus. But though DeFi made additional smaller trades, its 2025

[1] Unless otherwise noted, all emphases are added. Unless otherwise noted, "$" refers to U.S. dollars, and "CDN $" refers to Canadian dollars.

revenues fell far short of its 2024 results because the 2024 FTX trades were just a stroke of luck and in completing the trades, DeFi exhausted its balance sheet's ability to conduct trades of a similar size. DeFi's stock price fell from its Class Period high of $4.25 to end at $1.05, damaging investors.

3. In May through July 2024, DeFi found itself in a position to earn more than CDN $130 million buying tokens in the FTX bankruptcy estate's fire sale.

4. DeFi sells cryptocurrency token-backed exchange-traded products, or "ETPs" (ETP is an umbrella term that includes ETFs), to its customers. These ETPs are designed to give investors exposure to cryptocurrency tokens without the hassle of owning the tokens outright.

5. In 2021 and 2022, DeFi created and listed ETPs for 10 different cryptocurrencies. One of them, though by no means the most popular one, was Solana.

6. Initially, the Solana ETP's sales were not spectacular. By December 31, 2022, DeFi held only 0.42 million Solana tokens, worth CDN $5.4 million, or about 5% of the total value of its tokens.

7. But in the second half of 2023 and the beginning of 2024, sales of the Solana ETP took off. By September 30, 2023, DeFi held 0.93 million Solana tokens; by March 31, 2024, 1.70 million.

8. At the same time, the price of Solana soared tenfold from $21.40 on September 30, 2023, to $202.87 on March 31, 2024.

9. By March 31, 2024, Solana tokens made up 75% of DeFi's total monetizable balance sheet.[2]

---

[2] Excluding the value of Bitcoin and Ethereum tokens because they cannot be trading restricted.

10. The timing was fortuitous. At that very time, a cache of locked-up Solana tokens were entering the market. Bankrupt cryptocurrency exchange FTX and its affiliated cryptocurrency fund Alameda Research (collectively, unless otherwise noted, "FTX") had held more than 10% of all Solana tokens, most of which were subject to trading restrictions. In May 2024, FTX held a public and widely publicized auction of its locked-up Solana tokens. The tokens were sold at a discount because they were locked up.

11. DeFi indirectly placed a bid in the auction through a special-purpose fund. The bid was successful, and through its subscription, DeFi came to hold an interest in 1.61 million Solana tokens and a smaller position in Avalanche tokens. DeFi then substituted the locked-up tokens it had just purchased into its Solana and Avalanche ETPs, sold the freely tradable tokens that had backed the ETPs, and kept the profit. It made more than CDN $130 million buying Solana and Avalanche tokens from FTX's estate.

12. Defendants did not disclose the actual mechanism DeFi Alpha employed because it would reveal that the "trading desk" consisted of a series of lucky transactions with the FTX estate that could not be repeated at scale. Instead, Defendants told investors the transactions were repeatable and relied on deep market research and unique connections with other players in decentralized finance, which allowed them to identify regularly recurring opportunities for riskless profits. Defendants attributed the profits from the transactions with FTX's estate to this trading desk.

13. The mechanism Defendants used to complete the FTX transactions also circumscribed DeFi Alpha's potential revenues. After the substitution, nearly 90% of DeFi's Solana tokens were subject to trading restrictions. Thus, they were not available for a future DeFi Alpha transaction. Because the value of the coins on DeFi's balance sheet provided a hard limit

to DeFi Alpha's trading potential, DeFi Alpha was limited to the number of coins in DeFi's ETPs, less a reserve to cover redemption requests, and whatever discount it could negotiate for buying locked-up tokens.

14. Defendants also misleadingly told investors there was a new systematic arbitrage trading desk. Before DeFi Alpha, Defendants had aggregated daily ETP transactions, thereby earning limited revenues. DeFi rebranded those transactions as DeFi Alpha 'systematic arbitrage' without expanding their scope.

15. Defendants never had any hope of repeating the 2024 trade or of making up the gap through systematic arbitrage trading. But they used the myth to great effect. First, DeFi co-founder Johan Wattenstrom, DeFi Alpha's loudest booster, helped himself to a $26.3 million bonus based on the 2024 trade. When challenged by irate shareholders Defendants justified the bonus on grounds that shareholders could expect more hugely profitable DeFi Alpha trades and that DeFi needed to pay enormous bonuses to retain its supposedly top-tier trading talent.

16. Second, DeFi rode Defendants' misstatements about DeFi Alpha all the way to a NASDAQ listing. To list on the NASDAQ, DeFi told investors that it needed to raise its stock price to at least $2 under any possible scenario and keep it there. To stay listed on the NASDAQ, Defendants needed to keep DeFi's stock price above $1. To justify their claims that DeFi's stock was worth more than $2, Defendants claimed that the revenues from the FTX trade were actually recurring DeFi Alpha revenues. The market took heed; DeFi's stock price more than doubled with the DeFi Alpha trades. Had investors understood that DeFi Alpha was just DeFi's way of describing a one-off trade, they would not have bid up DeFi's shares.

17. But the limitations would sharply limit DeFi Alpha's revenue potential in 2025. In Q2 2025, Defendants issued guidance that included $102 million in DeFi Alpha revenues. At the

time, the value of DeFi's available tokens was smaller than the value of its Solana tokens alone when it completed the FTX trades.

18. Despite their rosy predictions, Defendants had little to show for DeFi Alpha in the first half of 2025, just one trade worth $17.3 million. To reassure investors, on the Q2 2025 earnings call, Defendant Wattenstrom made numerous specific and concrete representations about the deals that DeFi Alpha was at that very moment closing. He said that there were 15 of them and that DeFi only needed to close 9 or 10 of them to make guidance. He mentioned specific deal triggers, like price, that had to be met before the deal closed. And he told investors that DeFi could close all of the transactions.

19. But Defendants were not negotiating 15 mature, mutually executable transactions. They couldn't. DeFi needed to earn another $84.7 million to meet guidance. Even if it could replicate the discount rate it had earned in FTX's fire sale bankruptcy, DeFi's balance sheet could not generate enough revenue to meet guidance. So, it could not generate revenues that would substantially exceed guidance as Wattenstrom implied.

20. Defendants' reference to 15 jointly executable transactions reassured investors, as reflected in analyst reports issued immediately after the call.

21. Defendants wasted no time cashing in. The Q2 2025 earnings call took place on August 15. On August 22, Defendants initiated a stock buyback program, claiming DeFi's stock price was undervalued. On social media, DeFi insiders told investors that they would use revenues from DeFi Alpha to accelerate repurchases. On September 4, Defendants filed a prospectus for the sale of additional securities but stated that management had no current plans to raise any money. On September 8, Defendants told investors that DeFi had already bought back "**80,000**" (emphasis in original) shares and would continue to do so.

22. On September 25, DeFi told investors it was selling ***45,662,101*** units to investors, with a unit consisting of one common share and three-quarters of a warrant to purchase another common share, at a total per-unit price lower than its shares' trading price on August 22, which Defendants told investors undervalued DeFi.

23. Having announced in early November a single paltry trade earning $3.2 million in revenues, Defendants announced in Q3 2025 results, issued after market close on November 13, that they were removing the remaining $81.5 million in DeFi Alpha revenues from guidance.

24. As the markets slowly realized that the initial DeFi Alpha revenues were not repeatable, DeFi's stock price fell. It fell 11.5% on August 15, 2025, when Defendants announced that DeFi might not close DeFi Alpha transactions in 2025. It fell 18.4% on September 25, 2025, when Defendants announced DeFi was raising $100 million, a suspicious transaction because they would not have needed the cash if they could make $85 million in DeFi Alpha revenues. And it fell 27.6% over November 14 and 17, 2025, two consecutive trading days, when Defendants finally admitted that they did not expect any more DeFi Alpha revenues in 2025.

25. As this Complaint is filed, DeFi has not earned DeFi Alpha revenues since the tiny early November 2025 trade.

## II. JURISDICTION AND VENUE

26. The claims alleged herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

29. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of DeFi Technologies common stock in this District.

## III. PARTIES AND IMPORTANT NON-PARTIES

### A. Parties

30. Plaintiff Jaime Romero, as set forth in his PSLRA certification, which was previously filed and is incorporated by reference herein (Dkt. No. 11-2), purchased DeFi Technologies stock on the NASDAQ at artificially inflated prices during the Class Period and suffered damages thereby.

31. Plaintiff Blake Leonard, as set forth in his PSLRA certification attached hereto, purchased DeFi Technologies stock on the NASDAQ at artificially inflated prices during the Class Period and suffered damages thereby.

32. Plaintiff Thomas Ierubino, as set forth in his PSLRA certification attached hereto, purchased DeFi Technologies stock on the NASDAQ at artificially inflated prices during the Class Period and suffered damages thereby.

33. Defendant DeFi Technologies is organized under the laws of Ontario, Canada, with principal executive offices located at Suite 2400, 333 Bay Street, Toronto, Ontario, Canada M5H 2T6. Since May 12, 2025, DeFi's shares have traded on the NASDAQ under ticker symbol

"DEFT". Before then, DeFi's shares traded on the OTCQB in the United States and in several foreign exchanges. DeFi manages various crypto-related businesses.

34. Defendant Olivier Roussy Newton co-founded Valour Inc. and DeFi Technologies. Roussy Newton was appointed Chief Executive Officer on October 6, 2022 and elected Executive Chairman on June 20, 2023. Roussy Newton served as CEO and Executive Chairman throughout the Class Period and held those roles until he resigned from all then-held DeFi positions in November 2025. DeFi thereafter retained Roussy Newton as a Strategic Advisor beginning in December 2025. During the Class Period, Roussy Newton exercised substantial control over DeFi's public messaging and strategy, including statements concerning DeFi Alpha. Defendant Newton sat on DeFi Technologies' 3-member Compensation, Nomination and Governance Committee, even as he served as its CEO, a rare occurrence in public companies because it creates a potent conflict of interest.

35. Defendant Johan Wattenstrom co-founded Valour and DeFi Technologies. Wattenstrom served as DeFi's Chief Operating Officer from October 2021 until his resignation in October 2022. He remained an employee and director of Valour.[3] Throughout the Class Period, Wattenstrom repeatedly appeared on DeFi earnings calls, spoke substantively about DeFi Alpha, and described its trading strategy, pipeline, and expected contribution to future revenue. In November 2025, Wattenstrom was appointed Executive Chairman of the Board and Chief Executive Officer of DeFi, taking over from his co-founder Roussy Newton. The release announcing the replacement stated that he had shaped product strategy, trading architecture, and exchange relationships since inception.

---

[3] Various filings by BTQ Technologies Corp., where Wattenstrom served as a director, described him as Valour's COO.

36. During the Class Period, Defendant Russell Starr served as DeFi's Head of Capital Markets until his resignation in June 2025. Previously, Starr had served as DeFi's Chief Executive Officer and Executive Chairman until he was replaced by Roussy Newton in those roles in 2022 and 2023. Starr participated in DeFi's earnings calls and investor-facing communications, including discussions of DeFi Alpha's profitability, valuation implications, and expected contribution to DeFi's future results.

37. Defendant Curtis Schlaufman has served as the Vice President of Marketing & Communications for both DeFi and Valour since 2021. Defendant Schlaufman heads DeFi's investor relations department.

38. Wattenstrom, Roussy Newton, Starr, and Schlaufman are the "Individual Defendants."

### B. Important Non-Party

39. Valour Inc. is a wholly owned subsidiary of DeFi Technologies founded by Defendants Wattenstrom and Roussy Newton in 2019. Valour is incorporated under the laws of the Cayman Islands, and holds itself out as having a principal place of business in Zug, Switzerland. Valour manages DeFi's ETP business.

## IV. DEFENDANTS CLAIM A ONE-TIME FTX WINDFALL IS A RECURRING BUSINESS

40. "DeFi Alpha arbitrage trading desk" was the misleading name Defendants gave to a windfall trade. DeFi happened to hold an enormous cache of freely tradable Solana at the precise moment the FTX bankruptcy estate was forced to unload locked Solana. Defendants turned that coincidence into more than CDN $130 million, then turned the profit into a fiction: that they had built a new, sophisticated, systematic, risk-free arbitrage engine that would keep printing money. Defendants called that fiction DeFi Alpha.

### A. Defendants Claim They Have Created A New Sophisticated Arbitrage Trading Desk That Conducts Both Systematic Trading and Regular Large-Scale Trades

41. On May 15, 2024, in a press release discussing Q1 2024 results, DeFi Technologies stated that it had created a new business unit called DeFi Alpha. Defendants described DeFi Alpha as an "alpha-generating business … focus[ed] on arbitrage trading opportunities in the digital asset space with low risk in both centralized and decentralized markets … minimizing downside revenue volatility."

42. The announcement astounded investors. In less than a month, DeFi Alpha had earned more than three times DeFi's total Q1 2024 revenues. Defendants' reference to "centralized markets"—centralized crypto exchanges where investors can buy or sell freely tradable tokens—told investors that DeFi Alpha made money through public market arbitrage, which generates repeatable and predictable revenues.

43. On an earnings call held May 21, 2024, Defendants claimed that DeFi Alpha employed sophisticated arbitrage trading strategies. As Defendant Starr claimed, "because of the [crypto] industry and how nascent it is, you do see these arbitrage opportunities appear very, very regularly where you can take low-risk arb[itrage] positions and capture meaningful gains." Defendants claimed that DeFi Alpha involved "taking advantage of" "market inefficiencies."

44. Defendants promised more detail. According to Defendant Roussy Newton, DeFi would "launch[] a website that presents the business overview of DeFi Alpha in more specific context." He said that "more information [was] coming soon in terms of DeFi Technologies opening up our Alpha trading desk for more business and the specific parameters about what that business pertains to."

45. Defendants then posted DeFi Alpha's business overview on DeFi's website. While light on details, it maintained, concerning DeFi Alpha, that it "[u]tiliz[es] sophisticated

***algorithmic strategies*** and comprehensive ***market analysis*** … target[ing] ***inefficiencies and discrepancies*** in digital asset pricing to … identify and capitalize on low-risk arbitrage opportunities within the cryptocurrency market."[4]

46. On a call to discuss Q3 2024 earnings taking place on November 15, 2024, Wattenstrom stated that DeFi Alpha employed a sophisticated model-based arbitrage system:

> ***But obviously, we have also the systematic trading and the rationale for forming DeFi Alpha was also to make the monetization of the balance sheet in total, both fiat and crypto assets, much more efficient and drive the monetization rates.*** So, within that context, without taking any market exposure, we see a lot more opportunities now in Q4 in terms of all the arbitrages and short-term transactions that actually doesn't affect our exposure, but what we couldn't do earlier in that low turnover, lower AUM environment, so both the flow and increased AUMs and decreased number of assets are driving our opportunities we see and the opportunities we engage in at the moment and going forward throughout Q4.
>
> ***So it's not just going after one-off trades. It's also about building the infrastructure that we've been focusing on a lot since Q2. We have increased the bandwidth quite a lot in the team in regards to both development of infrastructure, agreements with counterparties, and the focus and the research into these opportunities.*** So, it's very hard to be very specific about this early on because obviously, it's something that is an immense growth in our ability to participate here during this quarter and last quarter.
>
> And a lot of the fruits of this work we'll probably see more of next year. But it's – yes, in this market environment, it's – since the bull market started here and bitcoin broke out to new all-time highs as well, that has just been an immense change for the daily opportunities in the more commoditized type of both model-driven and

---

[4] The disclosure reads:

> DeFi Alpha, a specialized arbitrage trading desk under DeFi Technologies, is designed to identify and capitalize on low-risk arbitrage opportunities within the cryptocurrency market. Utilizing sophisticated algorithmic strategies and comprehensive market analysis, DeFi Alpha targets inefficiencies and discrepancies in digital asset pricing to

The first sentence states DeFi Alpha's purpose, while the second sentence states the means by which it accomplishes the purpose and ends with a hanging "to." Thus, reasonable investors would assume that Defendants were communicating that Alpha accomplished the ends set out in the first sentence by the means set out in the second sentence and that the disclosure's facially incorrect phrasing is just an editing mistake.

> pure arbitrage opportunities we see as well. Yet that also paired obviously with our stronger balance sheets.

47. On November 14, 2024, Defendant Schlaufman posted to ceo.ca, an investor-related social media website, to explain DeFi Alpha's trading strategy, stating:

> Arbitrage trading is a strategy that capitalizes on price discrepancies between different markets or platforms. ***For simplicity, if Bitcoin is priced at $0.90 on one exchange and $1.00 on another, an arbitrage opportunity arises. By purchasing Bitcoin at $0.90 and selling it at $1.00, a trader can realize a profit from the price differential without exposure to market volatility. This form of trading is highly effective at generating risk-free gains by swiftly leveraging mispriced or discounted opportunities. Our DeFi Alpha strategy has resulted in no losses due to disciplined risk management and effective execution of these arbitrage opportunities. DeFi Alpha generated US$83.4 Million in Q2 and already reported a US$14.1 Million gain in Q3>***

48. Then on May 5, 2025, Defendants published a press release stating that "[i]n its first year of operations, DeFi Alpha generated C$132.1 million (US$96.8 million) in revenue ***through systematic arbitrage trading.***"

49. Defendants thus sold DeFi Alpha as two complementary revenue engines: a recurring systematic strategy and a stream of large, exclusive transactions.

50. Neither existed as represented.

**B. The Only Novel Portion of DeFi Alpha Was A Transaction With the FTX Estate**

1. A Fire Sale Creates a Once-In-A-Lifetime Windfall

51. In 2024, Defendants earned DeFi Alpha revenues in a series of trades involving the FTX estate that could not be repeated at scale.

52. Defendants made their successful 2024 "DeFi Alpha" trades through DeFi's exchange-traded products, or ETPs.

53. Valour, DeFi's principal subsidiary, offers ETPs. Instead of stocks, however, Valour's ETPs are based on cryptocurrency tokens.

54. Valour ETPs are backed by tokens. When investors buy ETP units from a Valour fund, the fund purchases the reference token to back the customer's ETP unit.

55. As a result, in the ordinary course of business, Valour comes to hold caches of cryptocurrency tokens.

56. In 2021 and 2022, Valour launched a series of ETPs based on ten different coins, one of which was Solana. Defendants plainly did not expect the Solana token to be a smash hit, announcing the Solana ETP listings alongside many others.

57. Valour's Solana ETP did not attract much interest at first. By December 2022, Valour had only 0.42 million Solana coins, worth CDN $5.4 million, or only about 5% of the total value of its coins. Bitcoin, Ethereum, and Cardano ETPs all attracted significantly more interest.

58. In 2023, sales of the Solana ETP took off. By September 30, 2023, Valour held 0.93 million Solana tokens, with a value as of that date of CDN $25.5 million. By December 31, 2023, Valour held 1.68 million tokens. By March 31, 2024, it held 1.70 million tokens.

59. Even as Solana ETP's sales grew, the price of Solana tokens soared from $21.40 on September 30, 2023 to $202.87 on March 31, 2024.

60. Because DeFi customers bought more Solana ETP units and because the price of Solana tokens soared, DeFi's Solana holdings rose to half of its total holdings.

*Solana Comes To Make Up Half of DeFi's Holdings*

| | September 30, 2023 | December 31, 2023 | March 31, 2024 |
|---|---|---|---|
| Number of tokens | 0.93 million | 1.68 million | 1.70 million |
| Price of Solana token | $21.40 | $101.51 | $202.87 |
| Total value of Solana tokens (CDN) | CDN $25.5 million | CDN $235.7 million | CDN $429.7 million |

| | | | |
|---|---|---|---|
| Total value of all tokens | CDN $178.7 million | CDN $489.9 million | CDN $875.4 million |
| Solana % of value of all tokens | 14.2% | 48.1% | 49.1% |
| Solana % of value of all tokens excluding Bitcoin and Ethereum[5] | 49.9% | 74.9% | 74.4% |




61. DeFi might not have been able to earn significant profits from its Solana ETP, despite its popularity. But in May 2024, by chance, a huge cache of locked-up Solana tokens came up for sale.

62. In November 2022, FTX—one of the largest crypto exchanges at the time—and its affiliate Alameda Research (collectively, "FTX") filed for bankruptcy.

[5] There is no mechanism to produce locked Bitcoin or Ethereum tokens.

63. Sam Bankman-Fried, FTX's CEO, was linked to Solana, promoting it on social media and describing himself as a "fanboy" of the token in a 2021 Forbes article.[6] He was also one of Solana's major backers and played a pivotal role in launching and sustaining a decentralized exchange that was one of Solana's flagship applications. FTX participated in multiple rounds of Solana funding.

64. As of the time of its bankruptcy, approximately $1.16 billion of FTX's $3.4 billion crypto portfolio consisted of Solana tokens. FTX held about 58 million Solana tokens, or about 11% of the total Solana supply. Much of FTX's holdings were subject to trading restrictions.

65. On December 16, 2023, the FTX debtors filed a proposed chapter 11 plan and disclosure statement. The proposed plan contemplated distributions principally in cash rather than distributions of the estate's digital assets in kind. The Bankruptcy Court had already authorized the debtors to sell, hedge, and stake digital assets and had approved Galaxy as the court-authorized investment manager for the monetization process.

66. On May 1, 2024, the bankruptcy court scheduled a June 25, 2024 hearing to consider the Disclosure Statement. The FTX estate intended to make distributions in cash rather than in kind, so it needed to sell FTX's Solana tokens in a hurry.

67. The estate initially sold the Solana tokens to crypto industry insiders. On April 5, 2024, FTX sold between 25 million and 30 million locked-up Solana tokens at $64 per token, to 69 well-connected crypto-industry funds. DeFi was not invited to participate, so it did not get the opportunity to buy tokens at $64. Neptune Digital Assets—a Canadian public crypto company

[6] Steven Ehrlich, *Billionaire Sam Bankman-Fried Pushes Back Against Critics of Crypto Derivatives*, Forbes (Aug. 30, 2021) available at https://www.forbes.com/sites/stevenehrlich/2021/08/30/billionaire-sam-bankman-fried-pushes-back-against-critics-of-crypto-derivatives/.

whose entire Solana balance after the transaction was only 31,181 tokens—obtained 26,964 tokens at $64.

68. Creditors alleged the sale process delivered windfall profits to well-connected crypto insiders because Solana tokens traded for $172 at the time of the sale. That the purchasers were clients of FTX's counsel further drew creditors' ire. Creditors pressed the bankrupt estate to use an open process to sell FTX's remaining Solana.

69. The pressure campaign worked. On April 22, 2024, the FTX debtors announced that the estate would make token sales through competitive institutional sales rounds, including by selling subscriptions to investment vehicles. Thus, through a once-in-a-lifetime piece of luck, DeFi found itself holding 1.7 million freely tradable Solana tokens just as FTX was liquidating tens of millions of locked-up Solana tokens not in a private sale from which DeFi was excluded but in bankruptcy auctions to which DeFi had access.

70. The sales were structured through special purpose vehicles created by Galaxy and a few other funds. Investors submitted bids on locked Solana tokens; successful bidders received interests in the special purpose vehicles indirectly entitling them to the locked tokens they had just purchased. DeFi participated in two funds through five separate purchases. Through those subscriptions, DeFi obtained an indirect interest in 1.61 million locked-up Solana tokens at a weighted average price of $101.4 per token, as well as 931 thousand Avalanche tokens it acquired at a weighted average price of $11 per token. Collectively, these trades are the "FTX Trades."

71. After each trade, DeFi sold corresponding numbers of freely tradable tokens (1.63 million Solana tokens and 931 thousand Avalanche tokens in total) that backed its ETPs and substituted in the locked-up tokens.

72. In doing so, DeFi substantially exhausted its supply of both Solana and Avalanche freely tradable tokens. As of June 30, 2024, DeFi held only 0.12 million freely tradable Solana tokens worth CDN $29.0 million. As of September 30, 2024, it held only 0.063 million freely tradable Avalanche tokens, worth CDN $2.4 million.

73. DeFi Alpha did not complete any trades in 2024 other than the FTX Trades.

74. Once DeFi exchanged its liquid inventory for locked tokens, the extraordinary capacity that made the windfall possible was gone. The trade could not recur at anything approaching the same scale unless DeFi again accumulated a massive liquid position in a token at the exact moment another forced seller offered an equally massive, locked position at a steep discount.

75. Post-Class Period disclosures confirm that there was never anything more to DeFi Alpha's one-off trades than locked token trades. Announcing Q3 2025 earnings, Defendants admitted that DeFi's arbitrage consisted of buying discounted tokens and selling corresponding publicly traded tokens:

> DEFENDANT WATTENSTROM: Yes. Happy to answer that. So basically, with that trade and I think two other trades historically, as I think we've communicated before, we have hedged all market risk for the core operation. We have a part of the profit, locked in profit for this trade and two of the historical trades ***has been retained in tokens.*** So to that respect, the profits - some of the profit is locked up and in tokens.
>
> So that part of the profit will obviously fluctuate a bit with the market. We will get the higher profit if trade market goes higher and slightly lower if market goes down. Whilst the core — the arbitrage itself is 100% hedged for the principal, ***the pure profit we locked in is retained in tokens that will be locked for a bit.***

76. On the Q4 2025 earnings call, Defendants disclosed that DeFi Alpha had limited capacity per coin.

> **Q:** Okay. That's great. And then I guess on DeFi Alpha, just -- I mean, is it fair to assume that in a crypto winter, there is probably less near-term opportunities for that business?

> **DEFENDANT WATTENSTROM:** Yes. I think it's fair to assume. I think for at least a few of them. I think there have been new opportunities on our radar here, which might be actually doable in this climate. But I would say, in general, we are also on our side, less keen to do it because ***we have a certain capacity per coin to pursue these trades without any market risk***. And obviously, with higher markets, we will make much, much more on the trades. So yes, there's less opportunity.

77. DeFi only had so much capacity per coin because it needed a freely tradable token for every locked-up token it purchased, plus a cushion to address redemption requests.

78. Then, in announcing Q1 2026 earnings, Defendants admitted that DeFi Alpha had no other strategy than locked-token trades. In DeFi's Q1 2026 MD&A, Defendants admitted that "DeFi Alpha trades made since the initial DeFi Alpha trade 2024 [sic] have ***all*** been locked token trades."

2. DeFi Alpha's Locked Token Strategy Is Risky, Has Limited Scope, and Is Easy for Competitors to Replicate

79. Defendants' statements that DeFi Alpha engaged in a broad variety of sophisticated arbitrage strategies concealed three main risks.

80. First, the initial FTX trade took an extraordinary coincidence. DeFi's Solana ETP had to take off in late 2023. At the same time, Solana's price had to increase massively—tenfold, in fact. Without these developments, which had nothing to do with DeFi's actions, DeFi would not have come to hold CDN $430 million of Solana tokens. But that in itself was not enough. To monetize its Solana tokens, DeFi also needed a third party forced to liquidate locked-up Solana tokens.

81. Second, the mechanism through which DeFi Alpha earns revenues confined its scope. To earn revenues, DeFi Alpha needs a freely-tradable token backing an ETP. But DeFi does not control its token holdings; its customers do by deciding which ETPs to purchase. So DeFi cannot build up a large token position of its own volition. Moreover, DeFi's individual token

holdings are a hard constraint on DeFi Alpha revenues. DeFi needs a freely tradable token for every discounted locked token it buys.

82. There are additional constraints. DeFi Alpha's revenues are the discount it earns on the locked-up tokens. Even in the FTX fire sale, DeFi Alpha was only able to negotiate a discount of 35.8%. At that discount, a $200 million balance sheet could only earn $71.6 million. Moreover, DeFi holds many tokens in only nominal amounts. If DeFi only holds $5 million of a coin, potential revenues from a trade are only $1.8 million at that discount. The transaction costs might swamp the small amount of revenue DeFi could earn from the trade, while the amount of management attention required for the trade might make it unfeasible.

83. And DeFi Alpha cannot sell all its freely-tradable tokens because it must retain a cushion to meet redemption demands. Valour's ETPs are sold pursuant to a base prospectus which provides purchasers the right to redeem their ETPs during approximately 96 days of the year. The base prospectus requires Valour to meet these redemptions in cash, not by distributing locked-up tokens. Unless DeFi keeps reserves of freely tradable tokens, it is vulnerable to a classic bank run. This is a serious risk because Valour experiences both enormous inflows and outflows from its customers. In 2024, while Valour had positive net inflows, it saw gross outflows from redemptions of $582 million; as of December 31, 2024, it had cash and cash equivalents of just $16 million.

84. Third, Defendants' false statements concealed that Alpha's business model is replicable by companies that hold caches of crypto tokens but whose liabilities are denominated in the token's price. DeFi purportedly takes no risk with Alpha trades because its ETPs track the price of its coins. For example, if an investor buys $200 of Solana when Solana is trading at $200 per token and redeems the investment when Solana is trading at $100 per token, Valour owes the

investor $100 (the value of one Solana token), not $200 (the initial investment).[7] But there are numerous other ways to replicate this structure. Many companies can create ETPs, but that is not even necessary. Some treasury companies—holding companies whose only asset is a cache of tokens—can offer the same service. Indeed, DeFi was hardly the only bidder in the Solana auction, and 69 crypto industry insiders participated in the initial $64 round.

### C. Defendants Rebrand Valour's Existing Flow and Liquidity Functions as a New Systematic Arbitrage Engine

85. DeFi Alpha's purported systematic arbitrage trading was merely a rebranding of its existing business earning revenues from typical broker-dealer activities of liquidity management and hedging activity that Valour had long practiced.

86. Valour was established in 2019. In its historic operations, before DeFi Alpha, Valour earned revenues from a simple trading strategy. Rather than immediately matching every customer-related purchase or sale with an equal and opposite trade, it combined the day's smaller flows, managed the resulting net position, and hedged that position at selected times.

87. Thus, as stated in Valour's 2023 financial statements for the year ended December 31, 2023, which predated, DeFi Alpha by almost a year:

> The Group earns revenue from aggregating small individual trades during the day to facilitate hedging and optimise liquidity and hedging them periodically. These are computed as net fiat receivables and are measured based on the average daily USD exchange rates at the end of each day.

88. At the time, DeFi did not refer to these earnings as arising from "arbitrage."

89. These transactions have a limited scope because they arise from ordinary customer and ETP flow, and produce only the spread, execution benefit, or liquidity improvement on a

---

[7] Ignoring all fees.

temporary net position. They do not create an independent source of large, scalable profits disconnected from customer turnover.

90. Accordingly, DeFi's revenues from these transactions were limited.

91. Valour also already had the infrastructure and market access needed to conduct that activity. In 2023 alone, Valour reported approximately US$233.7 million of digital-asset purchases and US$179.6 million of digital-asset disposals.

92. Investors had already valued the benefits of that flow aggregation and hedging as part of Valour's existing business. Similarly, because Defendants had not previously described Valour's cookie-cutter operations as "arbitrage," reasonable investors believed DeFi Alpha's systematic-arbitrage business was new.

93. Until Q3 2025, Defendants claimed that DeFi Alpha "[u]tiliz[ed] advanced algorithmic strategies and in-depth market analysis [through which] the trading desk aims to generate alpha by exploiting inefficiencies and discrepancies in digital asset pricing."

94. In Q3 2025, Defendants first disclosed that Valour's revenues were "similar to a broker dealer."

95. In DeFi's Q4 2025 MD&A, Defendants admitted that DeFi Alpha earned revenues from "opportunities sourced through deep market experience and strong counterparty relationships." They omitted the earlier reference to algorithmic strategies. Defendants described Valour's activities as "market making and liquidity provisioning [] [s]taking and yield generation on underlying assets." These terms are all consistent with DeFi's description of Valour's activities before DeFi Alpha. Thus, DeFi Alpha did not introduce any new systematic arbitrage trading business. Though Defendants did not disclose as much until after the end of the Class Period, DeFi Alpha's "systematic arbitrage" was simply Valour's old business rebranded.

**D. Defendants Benefit From Claims About DeFi Alpha's Repeatability**

1. Wattenstrom Makes $26.3 million From DeFi Alpha Trades

96. Through their false statements, Defendants created the misleading impression that the FTX trade revenues were repeatable and low risk, and required trading skill. Defendant Wattenstrom relied on the impression these statements created to obtain a $26.3 million discretionary cash bonus.

97. In 2024, Defendants awarded extraordinary bonuses to "management" attributed entirely to Alpha's success:

> During the year ended December 31, 2024, the Company paid management US$20,000,000 and 3,998,508 DeFi shares valued at US$6,273,870 related to DeFi Alpha trading profits.

98. While Defendants did not publicly identify the recipient of the largesse, DeFi's 2024 Management Circular reported that Wattenstrom received a discretionary 2024 bonus of CDN $37.3 million.[8] The bonus was 70 times his annual 2024 salary, almost CDN $15 million more than DeFi's total cash and cash equivalents as of December 31, 2024, and 28.2% of DeFi Alpha's total revenues to date. Defendant Roussy Newton, who co-founded Valour with Wattenstrom a decade earlier, and whom Wattenstrom later referred to as "my dear friend," sat on the three-member compensation committee that awarded the bonus.

99. Wattenstrom would not have been able to take almost 30% of DeFi Alpha's returns if he had disclosed that it resulted from sheer unrepeatable luck and FTX's desperation. Indeed, when Defendants tried to justify the bonuses without also claiming that the trades were repeatable, they faced an investor revolt.

---

[8] While Defendants did not identify the specific exchange rate used, at prevailing exchange rates in 2024, $26.3 million would amount to approximately CDN $35-37.9 million.

100. When they issued a press release announcing Q2 2024 earnings, Defendants did not raise full year 2024 revenue guidance to take into account potential additional DeFi Alpha returns. Between issuing the press release and the earnings call held hours later, investors expressed dismay. DeFi was forced to address the investor protest. In prepared remarks, DeFi's CFO stated:

> One of the major concerns that people have had with our [press release] today was that they're making the incorrect assumption that we're not going to make any more DeFi Alpha trades. Maybe you [Roussy Newton] or Johan [Wattenstrom] can elaborate on the fact that we are—the reason we didn't give guidance on DeFi Alpha further wasn't because we don't think we're going to continue to make money on DeFi Alpha. It was because we just want to get another quarter or two of decent returns under our belt so that we can guide appropriately.

101. As Defendants claimed in response to an analyst question, the bonuses were only justified because exploiting DeFi Alpha opportunities took a great deal of skill and DeFi Alpha trades were repeatable:

> **DEFENDANT ROUSSY NEWTON** [READING A WRITTEN QUESTION]: Next question is from Michael Kim. I appreciate the updated guidance revenue, but any change in thinking on the forward outlook for expenses, and particularly as it relates to accruing for DeFi Alpha trading bonuses?
>
> * * * * *
>
> **DEFENDANT STARR**: And maybe just I'll add just quickly, Mike. Mike is, by the way, the analyst at Zacks, just so everyone knows.
>
> Mike, the objective also is, with a consultant both on the legal and the consultancy side, this will be a fair, reasonable market standard. It's not something where we're not taking it seriously and looking at this from a prudent perspective. It'll be backed very, very clearly by market standards and these independent individuals.
>
> And on the flip side, with Johan [Wattenstrom] sitting here, I think everybody needs to understand what everybody's forgetting here, and I'm getting a lot of this today from people. It's like, well, you didn't guide higher on your trading desk, so you don't think you're going to make any more on trades. That's not at all what we did. What we decide to do was guide on basically AUM growth, which even that is ridiculously low. We're on-track for $50 million, $60 million, just off of our AUM, and obviously with Africa, Middle East, and all these other jurisdictions, that could be substantially higher. ***We fully believe that Johan and his team will continue to***

> ***execute. We just don't know what that quantum will be, but if you look at it from a large lens versus, oh, wow, look at their SG&A*** [the financial statement line item on which DeFi Alpha bonuses would be reported], ***that's not the way to look at this. These guys have hit it out of the park, and we want them to feel comfortable in their seats continuing to do so, which will benefit all shareholders.***
>
> Johan, I don't think —I think that's a very fair way of looking at it. ***You can't have people do what these guys have done and not take into consideration, nothing short of world-class returns.***

102. Thus, to respond to shareholder complaints, Defendants themselves linked the DeFi Alpha bonuses to purported skill and repeatability. They could not have paid bonuses if the DeFi Alpha trades were non-repeatable, took little skill, and exposed DeFi to catastrophic risks.

2. Defendants Continue to Tout DeFi Alpha In 2025 To List on the NASDAQ

103. Since at least early 2024, Defendants have maintained that DeFi's market valuation was far lower than its operations justified.

104. Defendants blamed, in part, the lack of a U.S. stock exchange listing. For example, on the Q1 2024 call, Defendant Newton explained that "we remain committed to extracting as much shareholder value and realize that, that will happen on a global stock exchange. So that is definitely a top priority for management." Indeed, as Starr explained on the June 30, 2024 Crypto Kids podcast, "[w]e're looking to uplist to the NYSE or NASDAQ when the share price gets high enough."

105. And Defendants understood and acknowledged that to be listed on the NASDAQ, under any scenario, DeFi's stock price had to exceed $2/share. As Starr continued on the podcast "we just need the stock to be at $2, and we're moving these closely."

106. Without DeFi Alpha, DeFi's stock price was not reaching the $2 threshold. With DeFi Alpha, DeFi's stock price had the chance to increase. Defendants' argument was based on their contention that DeFi Alpha was not a one-off trade but a persistent source of revenues. For

example, on the Q1 2024 call, Defendant Starr maintained that "I would argue, based on where we're guiding and based on what we've told you, we're actually cheaper now at [CDN] $1.10 or $1.20 than we were at $0.80 or $0.60 when we ***had a different revenue model because we hadn't started DeFi Alpha.***"

107. Defendants' claim that DeFi Alpha had transformed DeFi's revenue model had the effect Defendants intended. DeFi announced DeFi Alpha's first profits on the May 15, 2024, Q1 2024 press release. Within a month, and bolstered by a June 3 announcement of a further $43.4 million in profits, DeFi's stock price nearly quadrupled from $0.63 to $2.26.

108. As alleged above, DeFi investors were alarmed when they interpreted Defendants' statements to mean that DeFi Alpha revenues were not repeatable. Thus, Defendants had to convey that DeFi Alpha revenues were repeatable.

109. Having reached a $2 bid, DeFi filed a Registration Statement for a NASDAQ listing in mid-September 2024. DeFi was listed on the NASDAQ on May 12, 2025.

### E. Defendants Cite Purported DeFi Alpha Transactions So They Can Complete a $100 Million Offering To Obtain the Cash the Transactions Were Supposed to Generate

#### 1. Defendants' Token Holdings Are Not Sufficient to Repeat DeFi Alpha's 2024 Trading Returns

110. In 2025, Defendants claimed that they would repeat DeFi Alpha's 2024 performance, and announcing Q1 2025 results, they raised guidance to CDN $285.6 million.

111. Investors did not know that DeFi Alpha had no trading strategies other than buying discounted locked-up tokens, substituting them for freely tradable tokens in Valour's ETPs, and selling the freely tradable tokens. Thus, they did not know that DeFi Alpha would earn substantially less revenues in 2025 than 2024.

112. At no time during 2025 did Defendants have the available freely tradable tokens necessary to support guidance when it entered into the Solana trade, the total value of DeFi's Solana tokens was CDN $429.7 million, and its counterparty was desperate to sell. It still earned only CDN $113.8 million from the Solana transactions with the FTX estate and CDN $132.1 million when including the Avalanche transaction.

113. As of December 31, 2024, DeFi reported six positions, each worth more than CDN $15 million (excluding any locked-up tokens). The total value of these six positions was CDN $273.60 million, CDN $160 million less than its Q1 2024 Solana holdings.[9]

| | Coins | Value |
|---|---|---|
| Cardano | 69.67 million | CDN $87.11 million |
| Polkadot | 2.77 million | CDN $27.15 million |
| Ripple | 17.22 million | CDN $52.4 million |
| HBAR | 49.61 million | CDN $19.98 million |
| ICP | 1.44 million | CDN $20.93 million |
| SUI | 10.78 million | CDN $66.00 million |
| TOTAL | | CDN $273.60 million |

114. As of March 31, 2025, DeFi reported six positions in tokens, each worth more than CDN $15 million (excluding any locked-up tokens). The total value of these six positions was CDN $232.66 million.

| | Coins | Value |
|---|---|---|
| Cardano | 69.45 million | CDN $65.90 million |

[9] The tables in ¶¶113-115 exclude Bitcoin and Ethereum because there is no mechanism that can create locked Bitcoin or Ethereum tokens.

| | | |
|---|---|---|
| Polkadot | 3.10 million | CDN $18.20 million |
| Solana | 0.14 million | CDN $25.99 million |
| Ripple | 20.58 million | CDN $63.02 million |
| HBAR | 65.77 million | CDN $15.51 million |
| SUI | 13.31 million | CDN $44 million |
| TOTAL | | CDN $232.66 million |

115. As of June 30, 2025, DeFi reported five positions in tokens, each worth more than $10 million (excluding locked-up tokens). The total value of these five positions was $127.6 million.

| | Coins | Value |
|---|---|---|
| Cardano | 69.94 million | $39.50 million |
| Polkadot | 3.10 million | $10.52 million |
| Solana | 0.12 million | $18.36 million |
| Ripple | 22.03 million | $48.21 million |
| HBAR | 73.37 million | $10.97 million |
| TOTAL | | $127.6 million |

**2. Defendants Tout Illusory Deals to Meet Guidance**

116. On March 31, 2025, announcing DeFi's Q4 2024 results, Defendants issued 2025 revenue guidance of CDN $227 million. While Defendants did not provide specific guidance for DeFi Alpha revenues, on the Q4 2024 earnings call, Wattenstrom stated that all but CDN $90-100 million of the guidance was DeFi Alpha revenues, suggesting that DeFi Alpha accounted for CDN

$127-137 million—about the same as DeFi Alpha had earned in 2024. On the call, Wattenstrom emphasized that the guidance was "conservative" and did not assume growth.

117. On May 14, 2025, announcing Q1 2025 results, Defendants raised guidance to CDN $285.6 million. Defendants did not provide DeFi Alpha-specific guidance but Wattenstrom stated that DeFi Alpha was contributing slightly more to guidance than the initial number announced with Q4 2024 results.

118. Then, announcing Q2 2025 results, Defendants once again raised guidance to $218.6 million from CDN $285.6 million ($201.1 million), of which $102 million would come from DeFi Alpha trades. At the beginning of the Q2 2025 earnings call, Roussy Newton stated that he and Wattenstrom had reviewed the Company's position in detail the previous day.

119. When they announced Q2 2025 results, Defendants were pressured to justify their guidance. They had already spent months representing that this pipeline was mature. On the Q4 2024 call, Wattenstrom had stated that two larger Q2 deals were "more or less signed." Only one was ever executed, a May 2025 transaction involving the purchase of 18.7 million locked SUI tokens that generated approximately $17.3 million in DeFi Alpha returns. On the Q1 2025 call, Wattenstrom then stated that the pipeline had "strengthened significantly" and that Defendants were even more optimistic than before about the pipeline for the rest of the year.

120. Notwithstanding Defendants' enthusiasm, DeFi had fallen $5.5 million short of its first-half revenue guidance.

121. Thus, to reassure investors that the guidance remained possible, on the Q2 2025 earnings call, Wattenstrom made express statements of present fact touting supposedly concrete deals. On the call, Wattenstrom maintained that DeFi was negotiating 15 DeFi Alpha deals and expected 65% of them to close. He told investors that if 65% of the deals closed, DeFi would

meet guidance. He said the items were deals that DeFi "could do and hope[d] to do" during 2025. He told investors that he knew the counterparty, the conditions, the reasons for delay, and the expected timing of each of the individual transactions.

122. Wattenstrom described the deals, and their conditions, at length. He claimed that "there's different triggers for all of them. There might be some who do not want to execute before the price is at a certain level." He added that "these are deals where we have a very strong relation to the other, the counterparty and there's a strong will from both parties to do it." He also stated that the deals had not been outstanding materially longer than the Alpha trades already completed.

123. At the time, DeFi needed revenues of an additional $84.7 million to support earnings guidance. Wattenstrom claimed that it would achieve guidance by closing 65% of the deals, or between nine and ten, implying that the total value of the deals Defendants were negotiating was substantially higher than $84.7 million. By presenting the potential 15 trades, he told investors there was enough value and redundancy to absorb multiple failures.

124. Wattenstrom also stated that the transactions were deals that DeFi "could do and hope[d] to do" during 2025. So it could not be that the transactions were mutually exclusive because they relied on the same individual tokens. Rather, Defendants had to have enough coin reserves to cover every transaction.

125. Until the smaller Q2 2025 SUI transaction, every separately announced material Alpha return arose from the FTX estate. Even under the propitious FTX circumstances, the weighted-average discount on the locked-token purchases was approximately 35.8%.

126. As of June 30, 2025, DeFi's total balance sheet of tokens of which it held more than $10 million (excluding Bitcoin and Ethereum) was $127.6 million. Monetizing the entire

pool at the 35.8% discount would only earn $45.7 million, only slightly more than half of the required $84.7 million.

127. It would not have reached guidance even if it had monetized every non-Bitcoin, non-Ethereum, non-stablecoin token reported on its June 30, 2025 balance sheet that was not already locked and committed to the completed SUI transaction. Those tokens had a total value of approximately $193.1 million. At a 35.8% discount, monetizing that entire pool—while retaining no reserve for ETP redemptions—would have generated only $69.1 million, $15.6 million less than the $84.7 million DeFi still needed to meet guidance. To do so, Defendants would have had to find a locked-up token for every token in DeFi's inventory, leave no redemption reserve, pay no transaction costs, and receive the same unusually favorable discount.

128. Thus, Defendants did not have enough potential deals to cover DeFi Alpha guidance, let alone exceed it. Accordingly, the 15 deals were either overlapping coins, overstated, dependent on DeFi somehow selling large numbers of additional ETP units, or entirely fictitious.

129. Analysts repeated that the "over a dozen deals" supported approximately $85 million of second-half Alpha revenue. Moreover, Defendants' commentary convinced investors that the opportunities were only increasing. As a Northland Securities analyst wrote in an August 18 report:

> **Defi Alpha.** Recall on May 5th, DEFT announced that it executed a one-time arbitrage trade worth $22M (was revised to $17.3M for 2Q25 with rest later in year) through Defi Alpha (launched 2Q24), its specialized arbitrage trading desk. This trade was included in 2Q25 financials. While this isn't part of the core business, DEFT has been opportunistic with trades like these since launching the platform, and has generated $96.7M in revenue to date. **While only $17M in DeFi Alpha YTD, the company's guidance assumes $102M in revenue from DeFi Alpha, reflecting another ~$85M coming in 2H25, with over a dozen deals in the pipeline.** ***Additionally, it sounds like there is a growing pipeline of opportunities for these kinds of transactions.*** (bold italic emphasis added)

130. Likewise, in an August 19, 2025 report, a Compass Point analyst stated that "we believe DeFi Alpha's deal pipeline is worth ~$160m."

131. Analysts' reaction shows that the market understood the fifteen items as a real, executable pipeline capable of supporting guidance, not as a list of preliminary opportunities subject to undisclosed contingencies, and that they expected DeFi Alpha revenues to increase in the future. If investors understood the exact mechanism through which DeFi Alpha monetized the locked-up tokens, they would have understood that Defendants' numbers made no sense.

**3. DeFi Sells $100 Million of Its Artificially Inflated Stock**

132. Soon after the Q2 2025 earnings call, Defendants sold $100 million of shares and warrants even as they claimed DeFi's stock price was significantly undervalued.

133. Defendants have claimed for years that DeFi's stock was undervalued and that, as a result, using the stock as currency would improperly dilute investors. For example, on the Q3 2024 earnings call, asked "will future acquisitions be paid with share dilution," Defendant Starr answered "[w]e will ***never*** use shares to make acquisitions when our valuation is trading this low [approximately $2.10]."

134. While this theoretically raised the question of how DeFi would fund its operations, DeFi boasted that it did not need to raise capital. For instance, at a presentation at the June 3-5, 2025 Maxim Group 2025 Virtual Tech Conference, posted on DeFi's Twitter account on June 17, DeFi's President stated:

> Yeah, I think the closing remark would be that DEFT stock is trading at a multiple of, I think, something like six to nine times the comparable than our industry are trading in the 30 to 40 range. And yet somehow in the Web3 space, in the digital assets space, we're one of the few that are not only profitable, we're operating cashflow positive and continue to have projections of profit. ***We don't need to raise capital in order to fund our operations. We don't need to raise capital in order to actually conduct certain strategic acquisitions.***

135. Indeed, on the August 15, 2025 Q2 2025 earnings call, Roussy Newton said that DeFi "prints cash" and described it as "well capitalized." CFO Paul Bozoki stated that DeFi had "ample liquidity to meet our obligations."

136. On August 22, 2025, DeFi announced a share buyback program. The August 2025 program covered up to 31,673,791 shares and ran from August 26, 2025 to August 26, 2026. Announcing the buyback, DeFi stated:

> The Company is undertaking the [buyback program] because its management believes that, currently, and from time to time, the market price of its Common Shares may not reflect the underlying value of the Company's business and prospects. Management believes that, at such times, the purchase of Common Shares for cancellation would be in the best interests of the Company's shareholders and an appropriate use of its cash on hand. The Company's current cash balance is approximately US$19.8 million.

137. On August 22, 2025, DeFi's stock closed at $2.24/share.

138. On social media, Defendant Schlaufman explained that DeFi would continue to repurchase its shares and that buying might accelerate once DeFi earned cash from DeFi Alpha transactions.


[@CryptoAndy] it seems that the spotlight market is crypto friendly and faster then other exchanges. Today you launched again 8 ETPs in SEK. Have...
2 [@Cschlauf] Yes, Spotlight acts more like a partner to us. Other exchanges require more time for review and approval periods. from #defi, 27 Aug 2025, 14:10
2 [@Cschlauf] Spotlight is where we see the majority of our turnover and AUM. Our clients have always been crypto forward and savvy. from #defi, 27 Aug 2025, 14:12
7 [@Cschlauf] for now we are going to be buying back about 100k shares per week from #defi, 27 Aug 2025, 16:12
8 [@Cschlauf] as alpha deals come in we may make larger purchases as those bring in cash (USD) to the business from #defi, 27 Aug 2025, 16:13
8 [@Cschlauf] Most of our treasury is in crypto and we have to be cognizant of run rate. Otherwise we raise cash at these levels and dilute even more? Then buy back more stock? Seems inefficient- when the company executes the share price will eventually reflect that. (edited)
from #defi, 27 Aug 2025, 16:48

139. On September 4, 2025, DeFi filed a Shelf Registration for the offering of DeFi securities of any type at any time in the next 25 months. Announcing the filing, DeFi reassured investors that it had no plans to sell stock (or any other security):

> The Company has filed the Base Shelf Prospectus and Registration Statement to maintain financial flexibility, ***but has no present intention to undertake an offering of securities under the Base Shelf Prospectus.***

140. On September 8, 2025, DeFi published a press release with a monthly update. DeFi claimed in the introduction that "[m]anagement initiated the NCIB [a Canadian regulatory term for a stock buyback], citing undervaluation and reported ~US$19.8M in cash at announcement. 80,000 shares were purchased in the first week; ongoing purchases are expected with monthly reporting and filings."

141. On September 25, 2025, DeFi announced that it was selling 45,662,101 units to investors for $2.19/unit, for a total of $100 million, before commissions of $6 million and various fees of $0.7 million. That per-unit price is already $0.59/share lower than the average Q2 2025 purchase price.

142. Each unit consisted of one share and three quarters of a warrant to purchase one share for $2.63, exercisable upon issuance and expiring in 3 years. These warrants were valuable additional consideration. Indeed, for accounting purposes, DeFi later allocated approximately $53.2 million of the transaction's aggregate fair value to the warrant liability and only $46.8 million to the issued common shares.

143. As set out in the prospectus supplement, by September 25, 2025, DeFi had only repurchased 260,000 common shares at an aggregate gross purchase price of CDN$777,888.

144. The prospectus stated that the net proceeds would be used for working capital and to strengthen DeFi's balance sheet, notwithstanding Defendants' claim just months earlier that DeFi did not need capital to conduct operations or acquisitions. On a net basis, the capital raise was 3.5 times DeFi's cash and cash equivalents as of June 30, 2025. When challenged on both X.com and ceo.ca about the statements that Defendants had made about their intentions regarding their registration, Schlaufman demurred, claiming he was "not an insider" and was not privy to discussions about the financing of the registration.







145. That there was only 41 days between the August 15 call and the September 25 capital raise shows that Defendants were specifically contemplating the capital raise at the time of the call.

4. DeFi Announces Just One More Deal and Removes DeFi Alpha Forecasts

146. After the call, DeFi did not close 15 deals, or the 9 or 10 deals it claimed to be expecting to close in 2025. It closed one: a November 6, 2025 acquisition of 160,035 locked Solana tokens. Defendants reported that DeFi earned a total return of $3.2 million, or 3.8% of the remaining $84.7 million guidance, on the transaction.

147. On the Q3 2025 earnings call, taking place on November 14, 2025 (only 91 days after the Q2 call), DeFi cut full-year guidance from $218.6 million to $116.6 million—erasing the entire remaining DeFi Alpha revenue balance.

148. Defendants' admissions were a corrective disclosure of, and a materialization of the risk concealed by, Wattenstrom's August 15 statement that DeFi was negotiating 15 deals and that, by closing 9 or 10 of them, DeFi could meet its DeFi Alpha guidance.

149. On the Q3 2025 earnings call, Defendants maintained that the DeFi Alpha opportunities were merely delayed. But as this Complaint is filed, Defendants have yet to announce another DeFi Alpha transaction.

150. After the Class Period, Wattenstrom admitted that DeFi had "a certain capacity per coin" to pursue Alpha trades without market risk. DeFi later stated that all Alpha trades made since the initial 2024 trade had been locked-token trades. These admissions confirm the two premises of the foregoing arithmetic: Alpha required finite, coin-specific capacity, and the separately reported Alpha guidance depended on discounted locked-token transactions rather than an independent systematic revenue engine.

## V. LOSS CAUSATION

151. Defendants' false statements created the impression that Alpha's material 2024 revenue was produced by a repeatable systematic and opportunistic engine and that an identifiable 2025 pipeline would reproduce that result. During the second half of 2025, the market learned in stages that the opportunities depended on bespoke counterparties and triggers, that DeFi required substantial new working capital for the same trading functions, and that the forecasted DeFi Alpha revenue would not be realized in 2025. As those facts emerged and the concealed capacity risk materialized, DeFi's share price declined.

152. On August 14, 2025, after close of trading, DeFi raised its 2025 revenue guidance to $218.6 million. On the earnings call the following morning, DeFi held a call to discuss Q2 2025 earnings. On the call, Defendants stated that they could not guarantee that DeFi Alpha trades would even take place in 2025:

> Q: …You talked about how this year, some of these [DeFi Alpha] deals are taking a little bit longer than initially expect at least the first half of the year. I guess, what kind of gives you conviction that this can all kind of happen in the second half of the year? And I guess, do you see any risk that some of these deals can maybe slip into next year? Thanks.
>
> DEFENDANT WATTENSTROM: ***It's obviously extremely hard to say if any of these deals will slip into next year.*** Obviously we are working super hard to make sure they happen within this year and sooner rather than later. And I would say each and every of the deals we are working on—in our pipeline, there's different triggers for all of them. There might be some who do not want to execute before the prices is at a certain level. I think we have not really forecasted to be able to do all the trades in our pipeline, but rather, I think 65% of them because it's always something that falls off. So I wouldn't say it's an overly optimistic forecast. And I wouldn't say it has necessarily taken longer time with any of these than the trades we already executed. It's always negotiations and back-and-forth and depends also a bit the appetite depends a bit on the market conditions.

153. Defendants also partially disclosed the mechanics of DeFi Alpha trades. Roussy Newton disclosed that DeFi Alpha trades were "measured for us in coins" and then Wattenstrom similarly stated that the forecast assumed the "same number of coins for the same trades in the pipeline," and that greater AUM "in the assets where we can do these trades" increased DeFi's capacity.

154. Wattenstrom's explanation caused analysts to reevaluate DeFi Alpha. After the call, Compass Point changed its DeFi valuation methodology. Its analysts had previously based their valuation on a multiple of DeFi's revenues. Because the analysts characterized the DeFi Alpha revenues as recurring revenues, the multiple was high. But after the call, they stopped valuing these revenues as recurring, at least until DeFi Alpha was able to generate profit consistently. Instead, the analysts valued DeFi's ordinary revenues as recurring revenues, but valued DeFi Alpha based on its pipeline. The change reduced the analyst's price target from $6.50 to $5.00.

155. The disclosure was not complete. Wattenstrom still claimed DeFi Alpha had fifteen potential trades in its pipeline, and analysts continued to accept that DeFi Alpha's pipeline was

not the result of unique circumstances and continued to treat more than a dozen pipeline transactions as the basis of the approximately $85 million expected in the second half.

156. On August 15, 2025, the price of DeFi's shares closed at $2.31, down $0.30 (11.5%) from their previous close.

157. On September 25, 2025, DeFi announced that it was selling $100 million of its own stock.

158. The capital raise contradicted Defendants' statements. On the Q2 2025 earnings call taking place on August 15, 2025, Defendants had explained that they expected DeFi Alpha to generate $85 million in the remaining 5 months of 2025. DeFi Alpha trades generated copious amounts of cash. As Defendant Schlaufman had explained on social media on August 27, 2025, DeFi could use the cash these trades generated to repurchase more stock. Moreover, Defendants had claimed that DeFi's stock was undervalued at a price that exceeded the offering price and that DeFi Alpha trades would provide DeFi with the requisite capital. That DeFi would need to ***raise*** $100 million at a price Defendants claimed undervalued DeFi, rather than using the $85 million it expected to earn over the next 5 months to repurchase stock, called into question whether it really would imminently earn $85 million from DeFi Alpha's operations. By casting these doubts, the raise partially revealed the falsity of Wattenstrom's earlier statements about having 15 executable DeFi Alpha deals. However, because DeFi did not formally withdraw guidance, or in any other way admit that the 15 trades could not be executed, investors could not be certain that the deals would not be accomplished.

159. The $100 million capital raise was also the materialization of the risks concealed by Defendants' statements on the Q2 2025 earnings call. Because DeFi Alpha was not printing

cash, Defendants would need to raise it some other way—by selling DeFi stock. The capital raise was inevitable at the time of the Q2 2025 earnings call.

160. On September 25, 2025, DeFi's stock price fell from its previous close of $2.61 to close at $2.13, down $0.48 (18.4%), damaging investors.

161. After market closed on November 13, 2025, Defendants announced DeFi's Q3 2025 earnings. On November 14, 2025, before markets opened, Defendants also held a call to discuss DeFi's earnings.

162. In the press release, Defendants reduced guidance by the entire amount of the remaining DeFi Alpha returns, stating:

> **2025 Revenue Guidance:** The Company is revising its previously announced 2025 revenue guidance from **$218.6 million to $116.6 million**. This adjustment reflects a delay in executing DeFi Alpha arbitrage opportunities as a result of the proliferation of digital asset treasury companies and the consolidation of digital asset prices in the latter half of 2025, which has temporarily reduced arbitrage activity and compressed available trading spreads. With a strong balance sheet, bolstered by the recent $100 million equity financing, the Company is well positioned to compete for future high-margin arbitrage opportunities as market conditions evolve.

163. On the call, asked how DeFi Alpha hedged the locked-token trades, Defendants admitted that "hedging" consisted of selling freely-tradable tokens:

> Q: Do Alpha trades carry a liquidity or price liability? Could you please explain what happens with the May $23.8 million SUI trade, if prices lower or higher than $3.51 per token at maturity?
>
> Also, could you explain if and how DeFi is hedged if, for example, DeFi replaced 30% of their fee and liquid SUI tokens at their ETPs for these locked tokens in the March trade, and there is a run on 75% of the SUI? So basically, I think the question is, how are we hedged against these locked token trades, particularly if they don't realize — if they trade lower than the valuation they were acquired at at maturity?
>
> DEFENDANT WATTENSTROM: Yes. Happy to answer that. So basically, with that trade and I think two other trades historically, as I think we've communicated before, we have hedged all market risk for the core operation. We have a part of the profit, locked in profit for this trade and two of the historical trades has been

retained in tokens. So to that respect, the profits - some of the profit is locked up and in tokens.

So that part of the profit will obviously fluctuate a bit with the market. We will get the higher profit if trade market goes higher and slightly lower if market goes down. Whilst the core — the arbitrage itself is 100% hedged for the principal, ***the pure profit we locked in is retained in tokens that will be locked for a bit***. So we will — we might see some volatility there over time. There's a lot of upside and some downside, but it will not — the principal of that trade is locked up and hedged away.

***Same thing as historically, we've seen with some of the other trades as well, where we retain some of the parts in the actual token where we did the trade. And that' s something that we are keen to do for some of the assets where we have a high conviction and where we're building, where we have products and we're happy to support those ecosystems.*** And we believe the upside and potential is great and we have a lot of interactions and support those ecosystem and technologies for sure.

So yes, short answer, we have on the pure profit, there is a correlation to the market so it can go up or go down. And yes, I think, was there anything more specific Curtis that I missed there?

DEFENDANT WATTENSTROM: Yes. So that's the difference for different trades. If we do these trades in assets where we don't have a high conviction, we typically do not have an exposure at all. ***We lock in all fiat, all profit in fiat.*** For some others, we keep some of the profit in the assets.

164. Wattenstrom's answer revealed the simplicity of the DeFi Alpha mechanism. DeFi bought locked tokens. It "hedged" its exposure by selling freely tradable tokens worth, at a minimum, the fiat value of the trade. It either sold all the remaining freely tradable tokens or kept some if it expected the token's price to appreciate. There was nothing more complicated to DeFi Alpha than this mechanism and, therefore, DeFi Alpha needed one freely tradable token for every locked token it acquired.

165. Defendants' statements revealed to investors that DeFi Alpha did not rely on complicated arbitrage models, but instead simply bought discounted locked-up tokens and sold the corresponding freely tradable tokens. Further, removing guidance was the materialization of the risk concealed by Defendants' earlier false statements. Because DeFi Alpha was not in fact

negotiating 15 deals that could all be consummated without overlapping tokens, DeFi was bound to have to withdraw, or fail, DeFi Alpha guidance.

166. On November 14, 2025, DeFi's stock price fell from $1.45 to close at $1.23, down 15.2%. The next trading day, DeFi's stock price continued its decline to $1.05, down another 14.6%. In total, in two days, DeFi's stock price had fallen $0.40, or 27.6%, leaving investors with large losses.

## VI. DEFENDANTS' SPECIFIC ACTIONABLE STATEMENTS AND OMISSIONS

### A. Defendants' Statements Attributing DeFi Alpha Revenues to Systematic Arbitrage Trading and Claiming that DeFi Alpha's Strategy Was Low Risk

167. On May 15, 2024, in a press release discussing Q1 2024 results, DeFi Technologies announced that it had created a new business unit, which it called DeFi Alpha. In the press release, Defendants described DeFi Alpha as an "alpha-generating business … ***focus[ed] on arbitrage trading opportunities in the digital asset space with low risk in both centralized and decentralized markets*** … minimizing downside revenue volatility."

168. On May 21, 2024, the Company held its earnings call for the first quarter of 2024. When describing DeFi Alpha, Defendant Newton stated that "[t]he focus [of DeFi Alpha] is on arbitrage trading opportunities in the digital asset space ***with low risk in both centralized and decentralized markets with minimal or no protocol exposure thereby minimizing downside in revenue volatility***."

169. The emphasized statements were false because (1) to the extent DeFi Alpha had any trading in centralized markets, it was simply Valour's old business rebranded; (2) DeFi Alpha returns were not "low-risk" but were instead subject to the risk that if a mass of investors wanted to redeem their ETPs before the locked-up tokens became freely-tradable, DeFi Alpha would have to spend huge sums to ensure that it had enough liquidity to meet its obligation to back its ETP

tokens, a potentially catastrophic liquidity risks; and (3) DeFi Alpha's purported revenues did not result from systematic trading but only from locked token trades.

170. On June 3, 2024, DeFi published a press release reporting on DeFi Alpha's success. The release stated, in relevant part:

> **Toronto, Canada**, June 3, 2024 - DeFi Technologies Inc. (the "**Company**" or "**DeFi Technologies**") (CBOE CA: DEFI) (GR: R9B) (OTC: DEFTF), a financial technology company that pioneers the convergence of traditional capital markets with the world of decentralised finance ("**DeFi**"), is pleased to announce announces its new business line DeFi Alpha, a specialized arbitrage trading desk, ***has generated an additional C$59.2 million (US$43.4 million) from low-risk arbitrage trades. In its first few months, DeFi Alpha has come off to a promising start, generating approximately C$113.8 million (US$83.4 million).***
>
> * * * * *
>
> "We are thrilled with the instant success and sizable contribution of the DeFi Alpha trading desk to our revenue," said Olivier Roussy Newton, CEO of DeFi Technologies. "In the last two months alone, we have already booked C$113.8 million (US$83.4 million) from our new DeFi Alpha business line. With our focus on ***identifying and capitalizing on mispriced opportunities*** within the dynamic cryptocurrency market, we are confident that the DeFi Alpha trading desk will continue to deliver ***low-risk opportunities***, benefiting both our Company and our shareholders."

171. Defendants' statements were false because: (1) the $59.2 million generated resulted from a single set of transactions with the FTX estate, rather than numerous continuous arbitrage trades; (2) Defendants' reference to "mispriced opportunities" gave the misleading impression that DeFi engaged in classic multi-market arbitrage to generate the DeFi Alpha revenue when, in fact, Defendants bought tokens at the market price in a widely-publicized public auction (ensuring the tokens were not "mispriced") and paid less than the price of freely-tradable tokens because they were buying locked up tokens; and (3) DeFi Alpha returns were not "low-risk" but were instead subject to catastrophic liquidity risks.

172. On August 15, 2024, the Company held its earnings call for the second quarter of 2024. Defendant Roussy Newton stated that "DeFi Alpha's kind of sole focus is ***identifying low-***

***risk arbitrage opportunities within the ecosystem***, which kind of, as most people have seen, ***generated just over CAD133 million this quarter.*** And we're kind of just getting started with that business."

173. On the call, discussing the Company's new products, Roussy Newton stated:

> New website for Valour is now live and also DeFi Technologies website is rolling out over the course of the next few weeks to basically give shareholders and potential investors more information about all of our different subsidiaries that we're launching and will continue to launch, ***such as DeFi Alpha, which is very new*** but has made a new foundational impact on where we're headed as a business. And I think we're just scratching the surface.

174. Roussy Newton's emphasized statements were false because: (1) DeFi Alpha's returns resulted from participating in widely publicized FTX Solana token auctions, not from systematic trading; (2) the systematic trading portion of DeFi Alpha was not "very new," but was instead a rebrand of Valour's old trading strategy; and, as further set out below, (3) the DeFi Alpha discounted token trades were not "foundational" because they relied on a once-in-a-lifetime opportunity.

175. Additionally, in response to an analyst's question as to "how does a larger balance sheet impact your DeFi Alpha strategy" Defendant Wattenstrom said:

> Yes. To put DeFi Alpha into context, obviously, we have now more structure, the treasury and balance sheet management function. And part of that is to allocate the resources, balance sheets and liquidity among market making, liquidity provision, treasury model portfolio, the DeFi Alpha, ***both the systematic trading opportunities and the more super high margin one-off ones.*** I say one-off, but we have a lot of one-off ones continuously, hopefully, even in the future.
>
> ***So, obviously, the growing balance sheet and the increased liquidity allows us now to be part of a lot of different new trading strategies where we couldn't participate before.*** A lot of these are not really accessible for a lot of competitors. I don't want to go into too much detail there, but yeah, the answer is yes. Also, the balance sheet and the liquidity allows a lot of other strategies that we haven't really even gotten into yet, but are a better thing and will be able to execute on the back of that. So it's synergistic for sure.

176. Wattenstrom's emphasized statements were false because: (1) the "systematic" or "continuous[]" "trading opportunities" consisted of flow aggregation of the kind which Valour had historically conducted well before DeFi Alpha; (2) the transactions with the FTX estate were indeed one-off, so Wattenstrom's statement denying as much was false.

177. On or before August 15, 2024, DeFi Technologies posted a description of DeFi Alpha on its website. The description provided, in relevant part:

> DeFi Alpha, a specialized arbitrage trading desk under DeFi Technologies, is designed ***to identify and capitalize on low-risk arbitrage opportunities within the cryptocurrency market***. Utilizing ***sophisticated algorithmic strategies*** and ***comprehensive market analysis***, DeFi Alpha ***targets inefficiencies and discrepancies*** in digital asset pricing to [sic]

178. In the filings listed in this footnote,[10] the Company described DeFi Alpha as:

> [A] specialized arbitrage trading desk with the sole focus [sic] ***is to identify low-risk arbitrage opportunities*** within the crypto ecosystem. The Defi Alpha trading desk is strategically designed to focus on ***identifying and capitalizing upon arbitrage opportunities within the dynamic digital assets market. Utilizing advanced algorithmic strategies and in-depth market analysis, the trading desk aims to generate alpha by exploiting inefficiencies and discrepancies in digital asset pricing***. The primary focus is on arbitrage trading opportunities in both centralized and decentralized markets, ensuring ***minimal market or protocol exposure to mitigate downside revenue volatility.***

179. On November 15, 2024, the Company held a call to discuss Q3 2024 earnings. When discussing DeFi Alpha, Defendant Roussy Newton stated:

> De Fi Alpha, our rather new business unit compromising [sic] around trading activities, which has been off to a great start. And I know we get a lot of questions about guidance and how often, how frequently we see the kind of perpetual or nature of our training occur, which we'll touch on a little bit later within the presentation that ***we are—we—it's important to note that we don't—we don't take any risk at DeFi Alpha. So, there's never losses and things of that nature, but we are kind of algorithmically and with human intervention always assessing trades*** and hope to have a few more under our belt to be able to provide,

---

[10] MD&A for the quarters ending June 30, 2024, September 30, 2024, March 31, 2025, and June 30, 2025; Amended & Restated MD&A for the quarters ended June 30, 2024, and September 30, 2024; MD&A for the year ended December 31, 2024.

> I would say, the—our shareholders a better glimpse of what that looks like kind of going into the future.

180. The emphasized statements were false because: (1) DeFi Alpha's purportedly new "advanced algorithmic strategies and in-depth market analysis" was a mere rebranding of existing Valour activities like aggregating trades, which did not rely on "sophisticated algorithmic strategies" or "comprehensive market analysis"; (2) DeFi Alpha's trading took risks, including at least the risk of catastrophic liquidity failure, so Roussy Newton's statements that DeFi took "no risk" and "there's never losses or things of that nature" were false, as were statements that DeFi Alpha was "low risk."

181. On November 14, 2024, Defendant Schlaufman posted on his ceo.ca account (an investor-focused social media website) to explain DeFi Alpha's trading strategy, stating:

> For further clarity - Arbitrage trading is a strategy that capitalizes on price discrepancies between different markets or platforms. ***For simplicity, if Bitcoin is priced at $0.90 on one exchange and $1.00 on another, an arbitrage opportunity arises. By purchasing Bitcoin at $0.90 and selling it at $1.00, a trader can realize a profit from the price differential without exposure to market volatility. This form of trading is highly effective at generating risk-free gains by swiftly leveraging mispriced or discounted opportunities. Our DeFi Alpha strategy has resulted in no losses due to disciplined risk management and effective execution of these arbitrage opportunities. DeFi Alpha generated US$83.4 Million in Q2 and already reported a US$14.1 Million gain in Q3>*** This approach has significantly contributed to the company's strong financial health, allowing us to pay off more than $30 million in debt since May and over $50 million within the past year while embarking on a digital asset treasury strategy.

182. Schlaufman's emphasized statements were false because: (1) $83.4 million is actually the revenue Defendants earned from transactions in the FTX fire sale; (2) these transactions were not "swift," but would instead unfold over several years as trading restrictions on the Solana and Avalanche tokens lapsed; (3) none of the $83.4 million announced return was generated by pricing of the same tokens on different exchanges; (4) DeFi Alpha did not earn systematic arbitrage revenues from mispriced assets but instead from aggregating daily

transactions just like any broker dealer, Valour's existing business; and (5) DeFi Alpha's trading was not "risk free," in that it entailed a catastrophic liquidity risk. In sum, Defendant Schlaufman materially misrepresented every part of the mechanics of DeFi Alpha's trades, concealing both the risks and the hard limits on its ability to earn revenues.

183. On March 31, 2025, the Company issued a press release announcing its financial results for the fourth quarter of 2024 and the full year of 2024, and 2025 revenue guidance of CDN$227.2 million (US$159.9 million).

184. In the press release, describing DeFi Alpha, Defendants stated:

> **Strategic Focus and Competitive Edge:** DeFi Alpha was designed to ***capitalize on the Company's balance sheet through both systematic and opportunistic trading strategies.*** The approach uniquely positions DeFi Alpha to take advantage of market opportunities while leveraging its balance sheet advantages. Many of the trades pursued are exclusive, backed by strong partnerships and significant holdings tied to ETPs, making these opportunities largely inaccessible to other firms. This exclusivity, combined with efficient execution in low-competition areas, is what gives DeFi Alpha its strategic edge in the market.
>
> **Systematic Earnings and Opportunistic Trades:**
>
> - **Systematic Strategies**: ***Focus on low-risk, model-driven arbitrage and short-term opportunities that do not expose the company to broader market fluctuations. These trades remain highly effective, providing steady and predictable earnings.***
>
> ***
>
> **Outlook for 2025 and Beyond**: Looking ahead, DeFi Alpha is poised to capitalize on its unique positioning, ***leveraging both systematic and exclusive trading opportunities, along with strong partnerships and continued market growth***. At the same time, the ongoing infrastructure investments will ensure a solid foundation for long-term success, with sustained growth and continued strategic advancements as key focuses for 2025.[11]

[11] Defendants made identical statements in the Q1 and Q2 2025 earnings releases, released on May 14 and August 14, 2025, respectively, which were false for the same reasons.

185. Later in the Q4 2024 earnings call, Defendant Wattenstrom further stated, about DeFi Alpha:

> ***The other part here, which is more consistent on a day-to-day basis, is the more model-driven type of arbitrage strategies, which are kind of integrated with our daily flow management and also the management of our balance sheet in terms of monetization of our full balance sheet, including liquidity, digital assets and support, which gives us quite a unique position to take advantage of a lot of both arbitrage and other type of model-driven strategies***. We built out and continue to build out the infrastructure and models quite a lot in this area. So, that's one part of it, that we see strong growth in.

186. On that same earnings call Defendant Newton said "[a]nd just want to emphasize ***there are two parts to DeFi Alpha. It's the larger trades that we've seen, but also we have the daily systematic arbitrage*** through our daily flows that we see through our products."

187. After the call, on March 31, 2025, Defendant Schlaufman posted to social media site ceo.ca in his own name that DeFi Alpha included daily arbitrage:

> We also arb our trade flows. ***Tried to make that very clear on the call that yes, there are exclusive arb deals we get access to but we also have daily arb in our trade flows/ops. It was also clearly stated we have several deals lined up in the near term.***

188. Defendant Schlaufman added that:

> DeFi Alpha was created to focus on monetizing the balance sheet through ***systematic and opportunistic strategies, addressing both growing market opportunities and unique balance sheet advantages***. Many of the trades and opportunities pursued are exclusive due to strong partnerships and significant holdings tied to ETPs, making them inaccessible to most other firms. The ability to execute efficiently in areas with no meaningful competition underpins DeFi Alpha's strategic edge.
>
> * * * * *
>
> Investments in infrastructure, counterparty agreements, and research since Q2 are laying the foundation for sustained growth, with the full benefits expected to materialize in the next year (2025). DeFi Alpha is poised to capitalize ***on its unique positioning, leveraging systematic and exclusive trading opportunities, strong partnerships, and market growth*** to drive significant revenue in the short term while building a foundation for long-term success.

189. Defendants' highlighted statements were false because: (1) DeFi Alpha did not create any new systematic trading strategies, instead only rebranding Valour's old strategies; and (2) Defendants thereby made DeFi Alpha's revenues appear to be repeatable and predictable, when in fact they were the result of a once-in-a-lifetime opportunity.

190. On May 5, 2025, Defendants published a press release stating that "In its first year of operations, DeFi Alpha generated C$132.1 million (US$96.8 million) in revenue ***through systematic arbitrage trading.***"

191. Defendants' statements were false because all DeFi Alpha's revenues were generated through locked token transactions and, moreover, all were generated in a single series of transactions with the FTX estate.

192. On September 4, 2025, Defendants filed a Registration Statement on Form F-10. Defendant Roussy Newton signed the Form F-10. In the Form F-10, Defendants stated: "***Utilizing sophisticated algorithmic strategies and comprehensive market analysis, DeFi Alpha targets inefficiencies and discrepancies in digital asset pricing.*** Since its inception, DeFi Alpha generated over C$133.1 million (US$97.5 million) in cash and digital asset equivalents in 2024."

193. Defendants' statements were false because (1) DeFi Alpha's revenues of $97.5 million were entirely earned from locked token trades rather than sophisticated algorithmic strategies, comprehensive market analysis, or discrepancies in pricing; (2) by juxtaposing the two sentences, Defendants gave the misleading impression that the revenues were generated by DeFi Alpha systematic trading; and (3) DeFi Alpha's systematic trading revenue was Valour's preexisting business rebranded as Alpha.

B. Defendants' Statements About the Repeatability of Locked Token Trades and Competition[12]

194. On the May 21, 2024 earnings call, Defendant Starr stated, about DeFi Alpha, that:

> But from a trading desk perspective, like I said, I mean, like Johan is one of the most sophisticated long-lived crypto traders out there. His team and Oli are excellent at what they do. And all you really have to do is look at kind of Galaxy's revenue structure where actually the bulk of their revenues tend to come from trading profits, which are really hard to model out quarter-over-quarter.
>
> But because of the industry and how nascent it is, ***you do see these arbitrage opportunities appear very, very regularly where you can take low-risk arb positions and capture meaningful gains.***

195. Defendant Starr's emphasized statements were false because the "arbitrage opportunities" did not appear regularly but, instead, required that the sales of DeFi's Solana ETP soared even as the price of Solana increased tenfold and FTX's estate was liquidating holdings amounting to 11% of all Solana tokens.

196. On the August 15, 2024, earnings call, Defendant Roussy Newton stated that "DeFi Alpha's kind of sole focus is identifying low-risk arbitrage opportunities within the ecosystem, which kind of, as most people have seen, generated just over CAD133 million this quarter. ***And we're kind of just getting started with that business.***"

197. Roussy Newton also stated:

> New website for Valour is now live and also DeFi Technologies website is rolling out over the course of the next few weeks to basically give shareholders and potential investors more information about all of our different subsidiaries that we're launching and will continue to launch, such as DeFi Alpha, which is very new but has made a new foundational impact on where we're headed as a business. ***And I think we're just scratching the surface.***

198. On the August 15, 2024 earnings call, Defendant Wattenstrom stated:

---

[12]In many instances Defendants combined statements that misleadingly claimed that DeFi Alpha's revenues were earned from systematic trading with statements that claimed DeFi Alpha's trades were repeatable in one short excerpt. Thus, certain quotes are reproduced twice in this section. Different portions of the excerpts are highlighted and alleged to be false for different reasons.

> Yes. To put DeFi Alpha into context, obviously, we have now more structure, the treasury and balance sheet management function. And part of that is to allocate the resources, balance sheets and liquidity among market making, liquidity provision, treasury model portfolio, the DeFi Alpha, both the systematic trading opportunities and the more super high margin one-off ones. ***I say one-off, but we have a lot of one-off ones continuously, hopefully, even in the future.***
>
> So, obviously, the growing balance sheet and the increased liquidity allows us now to be part of a lot of different new trading strategies where we couldn't participate before. ***A lot of these are not really accessible for a lot of competitors.*** I don't want to go into too much detail there, but yeah, the answer is yes. Also, the balance sheet and the liquidity allows a lot of other strategies that we haven't really even gotten into yet, but are a better thing and will be able to execute on the back of that. So it's synergistic for sure.

199. Defendants' emphasized statements were false because: (1) Defendants were not "just getting started" or "scratching the surface" with DeFi Alpha, and it was not "foundational," as Defendants had exhausted DeFi Alpha's current possibilities, because they no longer had the CDN $430 million cache of freely tradable Solana tokens that had made the transactions with the FTX estate possible; (2) DeFi Alpha's impact was not "foundational" because it relied on an extraordinary coincidence that was not likely to recur at scale that was available to anyone with the resources to place a bid in the FTX auction; (3) DeFi Alpha's trades were accessible to its competitors, and, in fact, it had not been invited to participate in the round of favored buyers who were allowed to purchase locked Solana tokens at $64 per token; (4) DeFi Alpha did not have "a lot of one-off ones continuously," only the one opportunity created by the FTX fire sale; and (5) the DeFi Alpha trade was accessible to DeFi's competitors because it was completed through a widely-publicized public auction that drew numerous bids.

200. On the November 15, 2024, call, when discussing DeFi Alpha, Defendant Roussy Newton stated:

> ***I would say a lot of the trades we do are not open for any firm to just jump in and do prop trading***. I've been doing, obviously, prop trading systematic and optimistic the last 10 years in crypto. And within these areas, nothing has much

> changed here. What has changed is our balance sheet, our flows, our liquidity, and our opportunity ***to efficiently go after opportunities that not very many competitors can actually even execute if they wanted to. So, I think we both on the systematic side and the opportunistic side, we see no change in this in the near future.*** But rather, the growth of the ecosystem, the growth of mainstream adaptation, ***and so on, just gives us more and more opportunities, more than we actually have time to look at in spite of our growing bandwidth and focus on this area***. So, yes, for a near-term future—I don't see that change anytime soon.

201. The emphasized statements were false because: (1) DeFi Alpha's trading was easy to duplicate and, moreover, all of DeFi Alpha's revenues to date resulted from placing bids in a well-publicized auction that had been open to the public, having been excluded from the opportunity afforded to crypto industry insiders to purchase tokens at $64 per token; (2) Defendants' statements gave investors the impression that DeFi Alpha's trades were repeatable; and (3) DeFi itself did not have any opportunities to repeat the DeFi Alpha trades because in completing the initial trade, it had exhausted its cache of freely tradable Solana and Avalanche.

202. On March 31, 2025, the Company issued a press release announcing its financial results for the fourth quarter of 2024 and the full year of 2024, and 2025 revenue guidance of CDN$227.2 million (US$159.9 million).

203. In the press release, describing DeFi Alpha, Defendants stated:

> **Strategic Focus and Competitive Edge:** DeFi Alpha was designed to capitalize on the Company's balance sheet through both systematic and opportunistic trading strategies. The approach uniquely positions DeFi Alpha to take advantage of market opportunities while leveraging its balance sheet advantages. Many of the trades pursued are exclusive, backed by strong partnerships and significant holdings tied to ETPs, making these opportunities largely inaccessible to other firms. This exclusivity, combined with efficient execution in low-competition areas, is what gives DeFi Alpha its strategic edge in the market.
>
> **Systematic Earnings and Opportunistic Trades:**
>
> * * * * *
>
> **Opportunistic Trades**: These trades, ***often linked to partnerships and liquidity advantages***, are a critical part of the strategy but are inherently harder to predict or guide on a quarterly basis. Despite this unpredictability, they remain an important growth avenue for DeFi Alpha.

> ***
>
> **Outlook for 2025 and Beyond**: Looking ahead, DeFi Alpha is poised to capitalize on its unique positioning, leveraging both systematic and exclusive trading opportunities, along with strong partnerships and continued market growth. At the same time, the ongoing infrastructure investments will ensure a solid foundation for long-term success, with sustained growth and continued strategic advancements as key focuses for 2025.[13]

204. On March 31, 2025, Defendant Schlaufman stated that:

> DeFi Alpha was created to focus on monetizing the balance sheet through systematic and opportunistic strategies, addressing both growing market opportunities and unique balance sheet advantages. ***Many of the trades and opportunities pursued are exclusive due to strong partnerships and significant holdings tied to ETPs, making them inaccessible to most other firms. The ability to execute efficiently in areas with no meaningful competition underpins DeFi Alpha's strategic edge.***
>
> * * * * *
>
> Investments in infrastructure, counterparty agreements, and research since Q2 are laying the foundation for sustained growth, with the full benefits expected to materialize in the next year (2025). DeFi Alpha is poised to ***capitalize on its unique positioning, leveraging systematic and exclusive trading opportunities***, strong partnerships, and market growth to drive significant revenue in the short term while building a foundation for long-term success.

205. The emphasized statements were false because: (1) Schlaufman's statement that DeFi Alpha faced "no meaningful competition" and that its trades were "inaccessible to most other firms" "due to strong partnerships" were false: (a) DeFi Alpha's business model was easy to replicate by any firm with liabilities denominated in crypto; (b) all DeFi Alpha's revenues to date resulted from placing bids in a well-publicized auction that had been open to the public ***because*** DeFi was excluded from the opportunity afforded to better-connected crypto industry insiders to purchase Solana tokens at $64 each; (2) Defendants' statements gave investors the impression that DeFi Alpha's trades were repeatable; and (3) DeFi itself did not have any

[13] Defendants made identical statements in the Q1 and Q2 2025 earnings releases, released on May 14 and August 14, 2025, respectively, which were false for the same reasons.

opportunities to repeat the DeFi Alpha trades because in completing the initial trade, it had exhausted its cache of freely tradable Solana and Avalanche tokens.

C. False Statements that DeFi Alpha Was Negotiating 15 Deals as of August 15, 2025

206. On August 15, 2025, Defendants held a call to discuss Q2 2025 earnings. On that call, Defendant Wattenstrom[14] stated that DeFi Alpha was negotiating 15 opportunistic deals, and that if 9 or 10 of them closed, DeFi would meet DeFi Alpha guidance:

> It's obviously extremely hard to say if any of these deals will slip into next year. Obviously we are working super hard to make sure they happen within this year and sooner rather than later. ***And I would say each and every of the deals we are working on -- in our pipeline, there's different triggers for all of them. There might be some who do not want to execute before the prices is at a certain level. I think we have not really forecasted to be able to do all the trades in our pipeline, but rather, I think 65% of them because it's always something that falls off.*** So I wouldn't say it's an overly optimistic forecast. And I wouldn't say it has necessarily taken longer time with any of these than the trades we already executed. It's always negotiations and back-and-forth and depends also a bit the appetite depends a bit on the market conditions.
>
> In Q2 when the market came down for a lot of these tokens, there was a few of these that wanted to delay a little bit and I think that was to be expected. But I wouldn't say that any of these deals have been worked on for much longer-than-expected or the deals we actually have executed. ***So, these are deals where we have a very strong relation to the other, the counterparty and there's a strong will from both parties to do it. There might be some technicalities, there might be some incentive for some people to wait because of bad market conditions during Q2. But yeah, as I think I mentioned also, I think some of these might be much higher-value because of the higher price levels we see now, and we don't -- I don't assume we will do all of them, even though we hope to do 100%, but if we do 65% of them, we will be able to reach target.***
>
> ***Yeah, on an individual basis on each of these trades, it's -- I would say we have around 15 of these trades that we could do and hope to do this year. We don't think we'll do all of them, but that's not in the forecast either.***

[14] The Bloomberg transcript incorrectly attributes the statement to Olivier Roussy Newton. Plaintiffs listened to the audio and the speaker is Defendant Wattenstrom. S&P Capital IQ correctly attributes the statement to Defendant Wattenstrom.

207. Wattenstrom's statements were false because, for the reasons set out above, Defendants were not negotiating deals that could be jointly executed and would raise $84.7 million, allowing DeFi to meet guidance, still less exceed guidance. Because the trades themselves, if any even existed, could not be jointly executed, were preliminary, or were illusory, Defendants' statements describing them in detail were also false and misleading. DeFi simply did not have enough ETP tokens to support such transactions. Moreover, Defendants' concrete and specific statements about the deals gave investors the further impression that these were negotiated deals that were close to closing.

## VII. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

### A. Wattenstrom's $26.3 Million Bonus Attributed to DeFi Alpha Supports Scienter

208. Wattenstrom's bonus provided him a potent motive to make false statements. Wattenstrom received a $26.3 million bonus. Defendants justified the bonus by claiming that DeFi Alpha's 2024 performance was repeatable and that it took great skill, so that the traders (really Wattenstrom) had to be paid a $26 million bonus to stay with DeFi. Had Defendants admitted that DeFi Alpha consisted of just a few trades with FTX's estate, they might not have been able to pay Wattenstrom his bonus.

209. Roussy Newton sat on DeFi's three-member compensation committee.

210. Moreover, because Wattenstrom personally received the DeFi Alpha bonus, he must have been personally involved in and responsible for DeFi Alpha's operations, giving him knowledge of facts contradicting his claim.

### B. DeFi Alpha Was One of DeFi's Core Operations

211. DeFi Alpha accounted for half of DeFi's 2024 revenues. DeFi's 2025 revenue guidance assumed that half of DeFi's 2025 revenues would result from DeFi Alpha.

212. Defendant Starr referenced DeFi Alpha in his argument to investors that DeFi was undervalued.

213. Defendants separately reported DeFi Alpha's revenues. Defendants issued press releases whenever they closed a DeFi Alpha transaction.

214. Defendants Roussy Newton, Wattenstrom, and Starr also repeatedly discussed DeFi Alpha on company earnings calls.

215. Moreover, as further set out above, Defendants used the stock bump they created by pumping DeFi Alpha to raise DeFi's stock price above $2, permitting a NASDAQ listing.

### C. Defendants' Repeated Statements About DeFi Alpha Are Probative of Scienter

216. Defendants' statements to investors evinced familiarity with DeFi Alpha's operations.

217. For example, Roussy Newton and Starr discussed DeFi Alpha on every DeFi earnings call beginning with Q1 2024 when they began to discuss DeFi Alpha's revenue.

218. Starr served as Head of Capital Markets during the Class Period and participated in investor-facing communications concerning DeFi Alpha. He told investors that crypto arbitrage opportunities appeared "very, very regularly," that DeFi could take low-risk arbitrage positions and capture meaningful gains, and that DeFi Alpha supported a higher valuation for the Company.

### D. Schlaufman Publicly Provided A False Description of DeFi Alpha's Operations

219. As further set out above, in explaining DeFi Alpha's trading practice, Defendant Schlaufman told investors on the investor social media platform ceo.ca that arbitrage consisted of finding and exploiting discrepancies in pricing in different markets, citing as an example: "Bitcoin is priced at $0.90 on one exchange and $1.00… By purchasing Bitcoin at $0.90 and selling it at

$1.00, a trader can realize a profit from the price differential without exposure to market volatility."

220. Schlaufman's explanation shows that he understood the ordinary meaning of cross-market arbitrage. But DeFi Alpha did not engage in cross-market arbitrage. Thus, he knew that DeFi Alpha was not an "arbitrage trading desk" as he himself used the term.

221. Schlaufman had access to internal DeFi information and was responsible for its investor relations. Moreover, Schlaufman stated on his ceo.ca social media account that he regularly communicated with investors by email. He was therefore aware that his routine description of DeFi Alpha was false.

### E. Defendants' False Exculpatory Statements Support Scienter

222. Defendants' post-Class Period statements further support scienter. On the Q3 2025 earnings call, Defendants admitted that DeFi would not meet its prior revenue target. Defendants represented that DeFi Alpha revenues were merely delayed:

> DeFi Alpha opportunities have been delayed from the forecast due to the proliferation of digital asset treasury companies and the consolidation in digital asset price movements in the latter half of 2025, thereby delaying arbitrage opportunities and compressing available arbitrage profits.

223. Defendants also blamed external factors, including market conditions, counterparties, delays, digital asset price movements, and the proliferation of digital asset treasury companies.

224. Those explanations were exculpatory and misleading. In fact, the core problem was that DeFi Alpha's historical profits came from locked-token trades that depended on unusual circumstances, token capacity, and distressed sellers. By attributing the shortfall to external factors, Defendants attempted to preserve the false impression that Alpha was a real, repeatable arbitrage business whose opportunities had merely been delayed.

225. Defendants also told investors that the trades were merely delayed and would resume shortly. Yet Defendants have not completed a DeFi Alpha trade since November 3, 2025.

226. Defendant Schlaufman also falsely denied that he was a DeFi insider. When confronted with the September 25, 2025 $100 million offering, Defendant Schlaufman posted on both Twitter and ceo.ca that he was not affiliated with DeFi. Defendant Schlaufman's false denial of any affiliation immediately upon disclosure of its wrongdoing after a corrective disclosure shows that he made his earlier statements with scienter.

**F. Wattenstrom's Statements on the Q2 2025 Earnings Call Were Precise**

227. Wattenstrom made precise statements about the 15 agreements DeFi was supposedly negotiating, including that DeFi would meet guidance if it closed only 9 or 10 of them. As set out above, given the mechanism DeFi employed to earn revenues, specifically the amount of locked up tokens, it was not possible for DeFi Alpha to meet guidance, let alone significantly exceed it.

228. Wattenstrom also stated that DeFi Alpha's capacity to execute DeFi Alpha transactions had increased and that the relevant tokens had appreciated. Defendants thus professed familiarity with the specific affected tokens.

229. Moreover, Wattenstrom maintained that the deals had not been outstanding longer than expected and that DeFi and counterparties both had strong intentions to complete the transactions. Wattenstrom thus professed to have familiarity with the specific negotiations.

230. On the call, Roussy Newton stated that he and the management team had reviewed the figures in detail the previous day.

231. Wattenstrom's precise description of illusory deals supports scienter.

### G. DeFi's Capital Raise Supports Scienter

232. As set out above, 41 days after providing concrete assurances that DeFi would meet its 2025 guidance by closing 9 or 10 DeFi Alpha deals on August 15, Defendants raised $100 million by selling DeFi's stock on September 25. The offering contradicted Defendants' earlier statements. Defendants then revealed less than 2 months later that it could only complete 1 of the purported 15 DeFi Alpha deals.

233. Not only had Defendants insisted for more than a year that DeFi's stock price was undervalued, DeFi had launched a stock repurchase plan on August 22 in which it claimed that it was buying back its stock because it was undervalued. Defendants continued to tout the buyback program, periodically disclosing amounts purchased. Similarly, in a prospectus filed September 4, Defendants claimed that they had no present intention of selling any stock.

234. This timing shows that Defendants' statements were made for the specific purpose of permitting them to raise $100 million.

### H. Defendant Wattenstrom Was Personally Responsible for DeFi Alpha

235. That DeFi awarded Defendant Wattenstrom $26.3 million for DeFi Alpha's 2024 trades indicates that Wattenstrom was personally responsible for DeFi Alpha's operations.

236. Because of his familiarity with DeFi Alpha's operations, Wattenstrom knew that the facts underlying his specific concrete statements were false.

### I. DeFi Was a Small, Tightly Integrated Company

237. DeFi was a small, tightly managed enterprise. On the August 15, 2025 earnings call, Newton himself boasted that DeFi intended to be "one of the leanest revenue producing companies in the digital asset space listed on the NASDAQ."

238. In its 2024 Annual Information Form, DeFi disclosed that the three operating groups from which DeFi Alpha drew personnel—and for which DeFi reported employee counts—

employed only 26 people: eight at Valour, two at Reflexivity Research, and sixteen at Stillman Digital. Even after counting consultants, the organization remained compact. DeFi Alpha itself had no full-time employees or consultants of its own.

239. DeFi also claimed that its ability to compete depended on the knowledge, experience, and business contacts of its management and directors, and that Alpha sourced opportunities through market experience and counterparty relationships. Alpha's deal flow therefore came through the same concentrated management network that designed the strategy, negotiated with counterparties, set revenue guidance, and spoke to investors.

240. Nor did the alleged fraud concern thousands of routine transactions that could blur together. The material Alpha revenue came from a handful of individually enormous locked-token transactions. The 2025 forecast, in turn, depended on approximately nine or ten of roughly fifteen supposed deals. In a company of DeFi's size, the existence, coin-specific capacity, negotiation status, and expected value of a few transactions that were supposed to supply approximately half of annual revenue necessarily reached the executives who made the detailed public statements alleged herein.

**J. Defendants All Acted With Scienter**

241. Defendant Wattenstrom was the DeFi executive with the most direct responsibility for and involvement with DeFi Alpha, received a $26.3 million bonus for its operations, and made numerous specific, concrete statements about its operations. He was also its loudest booster. When he had to admit that DeFi Alpha would not complete any more transactions in 2025, he falsely claimed that the transactions were merely delayed and would close sooner or later.

242. Defendant Roussy Newton was DeFi's CEO and sat on the three-member compensation committee that awarded Wattenstrom a $26.3 million bonus for his work on DeFi Alpha. He also made numerous concrete statements about DeFi Alpha.

243. Defendant Schlaufman was DeFi's head of investor relations. He made detailed statements about DeFi Alpha in which he analogized its operations precisely to multiple-market arbitrage, even though DeFi Alpha's systematic trading business was simply Valour's old trade aggregation business rebranded and its one-off transactions consisted of buying locked-up tokens at the market price and selling off freely-tradable tokens. He claimed in August 2025 that DeFi would continue and even accelerate stock repurchases then, when the September 25, 2025 offering proved that his statement was false, denied being a DeFi insider.

244. Defendant Starr claimed that DeFi Alpha opportunities appeared "very, very regularly," though they had only happened once and in circumstances that made clear they would not happen at scale again. He defended Wattenstrom's bonus by falsely claiming that DeFi Alpha trades took great skill. And he publicly linked DeFi Alpha's purportedly new trading model to DeFi's valuation.

245. All Defendants were part of a small company with a total of 26 employees at most and no more than 8 employees working at Valour. All Defendants were part of a company that earned, or claimed it would earn, half its revenues from DeFi Alpha. And all Defendants spoke regularly about DeFi Alpha, defended it to investors, and made it part of DeFi's story.

## VIII. AGENCY

246. DeFi is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common-law principles of agency because the wrongful acts complained of herein were carried out within the scope of their employment or agency for DeFi. The challenged statements were made in DeFi's press releases, earnings calls, MD&A filings, investor presentations, and investor-facing communications, all for the purpose of communicating DeFi's business, financial results, revenue guidance, valuation, and prospects to investors.

247. The scienter of the Individual Defendants and other employees and agents of DeFi is similarly imputed to the Company under *respondeat superior* and agency principles. Newton was DeFi's Chief Executive Officer and Executive Chairman throughout the Class Period. Starr was DeFi's Head of Capital Markets and a former Chief Executive Officer and Executive Chairman. Wattenstrom was DeFi's co-founder, former Chief Operating Officer, frequent investor call participant, and the executive most closely associated with DeFi Alpha. Schlaufman was DeFi's Vice President of Marketing and Communications and handled investor-facing communications concerning Alpha. Each acted within the scope of his role when making or disseminating the challenged statements.

## IX. PLAINTIFFS' CLASS ACTION ALLEGATIONS

248. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of persons or entities who acquired DeFi stock on the OTCQB in the United States from May 15, 2024 through May 11, 2025, or on the NASDAQ from May 12, 2025 through November 13, 2025, ("Class Period"), and who held such shares through at least one of the corrective disclosures identified in Section V., bringing claims under Sections 10(b) and 20(a) of the Exchange Act. Excluded from the Class are Defendants, the officers and directors of DeFi Technologies, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest, claims arising from purchases of shares not made on the NASDAQ or over the counter in the U.S. Also excluded from the Class are persons who purchased DeFi Technology shares over the counter in the U.S. in transactions originating outside the U.S.

249. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DeFi Technologies securities were actively traded on the NASDAQ or over the counter. While the exact number of Class members is unknown to

Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members of the proposed Class.

250. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

251. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

252. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused DeFi Technologies to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in making the statements;

- whether the prices of DeFi Technologies securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

253. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. PRESUMPTION OF RELIANCE

254. In addition, common issues of fact and law predominate over individual issues. In particular, to avoid individual proof of reliance, Plaintiffs invoke, in part, the presumption of reliance established by the fraud-on-the-market doctrine in that:

- DeFi Technologies securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market, and before that was traded OTC and on several different foreign exchanges;
- DeFi Technologies' securities were liquid and traded with moderate to heavy volume during the Class Period;
- As a regulated issuer, DeFi Technologies filed periodic public reports with the SEC, Canadian regulators, and the NASDAQ;

- DeFi Technologies regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
- Unexpected material news about DeFi Technologies was rapidly reflected in and incorporated into its stock price during the Class Period.

255. As a result of the foregoing, the market for DeFi Technologies' securities promptly digested current information regarding DeFi Technologies from all publicly available sources and reflected such information in the price of DeFi Technologies' securities. Under these circumstances, all purchasers and acquirers of DeFi Technologies securities during the Class Period suffered similar injury through their purchase or acquisition of DeFi Technologies securities at artificially inflated prices and the presumption of reliance applies.

256. Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired DeFi Technologies securities at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972).

## XI. COUNT I

### Violations of Section 10(b) and Rule 10b-5 Against All Defendants

257. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258. Plaintiffs assert this claim against Defendants based on Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

259. Defendants made the allegedly false statements alleged herein.

260. Defendant DeFi, as well as individual defendants Wattenstrom, Roussy Newton, Starr, and Schlaufman, and other senior DeFi Technologies officers and employees, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendants' statements directly affected the price of DeFi Technologies securities during the Class Period.

261. Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of DeFi Technologies were materially false and misleading; knew or were reckless in not knowing that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

262. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of DeFi Technologies securities during the Class Period in purchasing or otherwise acquiring

DeFi Technologies securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

263. Had Plaintiffs and the other members of the Class been aware that the market price of DeFi Technologies securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased or otherwise acquired DeFi Technologies securities at the artificially inflated prices that they did, or at all. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase or acquisition of DeFi Technologies securities during the Class Period.

264. This action was filed within five years of each of Defendants' fraudulent statements and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## XII. COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

265. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

266. During the Class Period, the Individual Defendants participated in the operation and management of DeFi Technologies, and conducted and participated, directly and indirectly, in the conduct of DeFi Technologies' business affairs. Because of their senior positions, they knew the adverse non-public information about DeFi Technologies' operations.

267. As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DeFi Technologies' operations, and to correct promptly any public statements issued by DeFi Technologies which had become materially false or misleading.

268. Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DeFi Technologies disseminated in the marketplace during the Class Period concerning DeFi Technologies' operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DeFi Technologies to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DeFi Technologies within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DeFi Technologies securities.

269. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DeFi Technologies.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demands a trial by jury.

Dated: September 1, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Horne*
Jonathan Horne
Phillip Kim
Laurence Rosen
Henry Bloxenheim
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
jhorne@rosenlegal.com
philkim@rosenlegal.com
lrosen@rosenlegal.com
hbloxenheim@rosenlegal.com

*Lead Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2026, I electronically filed the foregoing ***Second Amended Complaint for Violations of the Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

/s/ *Jonathan Horne*
Jonathan Horne